**TEXAS ANTIQUITIES COMMITTEE et al., Appellants,**

v.

**DALLAS COUNTY COMMUNITY COLLEGE DISTRICT, Appellee.**

No. B–6107.

Supreme Court of Texas.

July 13, 1977.

Rehearing Denied July 27, 1977.

John Hill, Atty. Gen., Austen H. Furse, Asst. Atty. Gen., Austin, for appellant.

Strasburger, Price, Kelton, Martin & Unis, Patrick F. McGowan, H. P. Kucera, Dallas, Clark, Thomas, Winters & Shapiro, Barry K. Bishop and Mary Joe Carroll, Austin, for appellee.

POPE, Justice.

Dallas County Community College District filed this suit for injunction against the Texas Antiquities Committee and its members to set aside an order of the Committee denying a permit to demolish three buildings owned by the College District. The trial court rendered judgment for the College District, stating that in its judgment section 6 of the Antiquities Code is both unconstitutional and unconstitutionally applied. This court has jurisdiction by direct appeal. Tex.Rev.Civ.Stat.Ann. art. 1738a (1962); Tex.R.Civ.P. 499a.

Dallas County Community College District came into existence in 1965 as authorized by section 130.005 of the Texas Education Code. Its Board of Trustees "constitutes a body corporate" which may "acquire and hold real and personal property, sue and be sued," and has "the exclusive power to manage" the College District's affairs. Tex.Educ.Code Ann. § 23.26. Acting under its legislative authorization, the College

District in 1966 purchased land in downtown Dallas on which there were four buildings; the cost of the purchase was 2,150,000 dollars. The City of Dallas permitted temporary limited use of the three older buildings upon assurance that they would be demolished within three to five years. Plans for the demolition of the three older buildings were announced to the public as early as 1969.

The Board of Trustees of the College met in 1972 and voted to restore the one building that was structurally sound and to demolish the three older buildings so the space could be used for new college facilities. The Board met on April 1, 1975, to consider demolition bids, but a group of citizens requested a ten-day delay during which time the group hoped to find funds for rebuilding the three buildings which were set for demolition. The group was unsuccessful in finding any funds, but it reported to the Board that on April 8 the buildings had been placed on the National Register of Historical Buildings. No prior notification was given the College District that an expedited application was being made for inclusion of the buildings in the National Register.

After the College District purchased the land and buildings in 1969 and made its plans for the College's efficient use of the land, the legislature enacted the Antiquities Code. Tex.Rev.Civ.Stat.Ann. art. 6145–9 (1969). The Antiquities Code provided for an Antiquities Committee consisting of seven members. Tex.Rev.Civ.Stat.Ann. art. 6145–9, § 3 (1969). Section 4 of the Code gives the Antiquities Committee the authority "to determine the site of, and to designate, State Archeological Landmarks . . . ." Section 10 proscribes any construction on any State Archeological Landmark without first obtaining a permit from the Antiquities Committee.[1] Section 10 is the only provision of the Code which in any way entitles the Committee to grant or deny a permit for the demolition of the buildings. The Antiquities Committee has not designated any of the three buildings at issue as State Archeological Landmarks, but the Committee has denied the College District's request to demolish the buildings based upon the buildings' expedited inclusion in the National Register of Historic Sites and Buildings. The Antiquities Code does not give the Antiquities Committee authority over buildings in the National Register; instead, the Code only gives the Committee authority over buildings which the Committee has designated as a State Archeological Landmark. Since the Committee has not designated the buildings as State Archeological Landmarks, the College District does not need the Committee's permission before demolishing the buildings.

The trial court grounded its judgment upon two separately stated and separately numbered adjudications:

1. Section 6, Article 6145–9, V.T.C.S., reading as follows:

Sec. 6. All other sites, objects, buildings, artifacts, implements, and locations of historical, archeological, scientific, or educational interest, including but expressly not limited to, those pertaining to prehistoric and historical American Indian or aboriginal campsites, dwellings, and habitation sites,

1. Sec. 10. The Antiquities Committee shall be authorized to issue permits to other state agencies or institutions and to qualified private institutions, companies, or individuals for the taking, salvaging, excavating, restoring, or the conducting of scientific or educational studies at, in, or on State Archeological Landmarks as in the opinion of the Antiquities Committee would be in the best interest of the State of Texas. Such permits may provide for the retaining by the permittee of a portion of any recovery as set out for contracting parties under Section 9 hereof. Such permit shall provide for the termination of any rights in the permittee thereunder upon the violation of any of the terms thereof and to be drafted in compliance with forms approved by the Attorney General. All such permits shall specifically provide for the location, nature of the activity, and time period covered thereby. No person, firm, or corporation shall conduct any such operations on any State Archeological Landmark herein described without first obtaining and having in his or its possession such permit at the site of such operation, or conduct such operations in violation of the provisions of such permit.

their artifacts and implements of culture, as well as archeological sites of every character that are located in, on or under the surface of any lands belonging to the State of Texas or by any county, city or political subdivision of the state are hereby declared to be State Archeological Landmarks and are the sole property of the State of Texas and all such sites or items located on private lands within the State of Texas in areas that have been designated as a "State Archeological Landmark" as hereinafter provided, may not be taken, altered, damaged, destroyed, salvaged, or excavated without a permit from, or in violation of the terms of such permit of, the Antiquities Committee.

is unconstitutional and void, and the orders of the Defendants based thereon are unconstitutional and invalid.

2. Plaintiff need not obtain a permit from the Defendants before demolishing the three buildings in question situated on Plaintiff's El Centro Campus in the City of Dallas, Dallas County, Texas, and bounded by Elm, Austin, Main and Lamar Streets in said city; and the application of the Texas Antiquities Act, Article 6145–9, to these buildings is unconstitutional as applied.

We affirm the trial court judgment and will now examine each of its separate adjudications.

## UNCONSTITUTIONALLY VAGUE STATUTE

The first basis of the trial court's judgment was that section 6 of the Antiquities Code, stated above, was unconstitutionally vague. There has been no contention that the three buildings in question possess archeological, scientific, or educational interest. The Antiquities Committee only contends that the buildings are of "historical interest." The sole basis for the exercise of the Antiquities Committee's power over the three buildings is found, if it can be found, in these words of the statute:

Sec. 6. All . . . buildings . . . and locations of historical . . . interest.

The Antiquities Committee, although it has the power, by article 6145–9, section 11, has adopted no rules or standards which state criteria for "buildings . . . and locations of historical . . . interest." The Antiquities Committee does not contend that section 6 gives any predictable standard or safeguard. Its position is that the law which strikes down statutes because they are vague, overbroad, and uncertain should be overruled. It argues that the power of the legislature to delegate its powers to state boards and commissions should be unlimited so long as there are experts who constitute the membership of the Committee.

There has been called to our attention no case in Texas or elsewhere in which the powers of a state board are more vaguely expressed or less predictable than those permitted by the phrase in question. The word "buildings" comprehends all structures; "historical" includes all of the past; "interest" ranges broadly from public to private concerns and embraces fads and ephemeral fascinations. All unrestorable structures ordinarily hold some nostalgic tug upon someone and may all qualify as "buildings . . . of historical . . . interest."

■ Upon the basis of the statute now before us, we are unconvinced that we should renounce the settled law of Texas that the legislature may not delegate its powers without providing some criteria or safeguards. Depending upon the nature of the power, the agency, and the subject matter, varying degrees of specific standards have been required in testing the reasonable breadth of statutes. 1 Sutherland, Statutory Construction, § 4.05 (4th ed. 1975); *Jordan v. State Board of Insurance*, 160 Tex. 506, 334 S.W.2d 278 (1960). Sound reasons support the rule that some reasonable standard is essential to the constitutionality of statutory delegations of powers to state boards and commissions.

Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give

the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. [Footnote omitted.] Second, if arbitrary or discriminatory enforcement is to be prevented, laws must provide explicit standards to those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on *ad hoc* and subjective basis, with the attended dangers of arbitrary and discriminatory applications. *Grayned v. City of Rockford,* 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (1972).

We adhere to the settled principle that statutory delegations of power may not be accomplished by language so broad and vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.,* 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926). We are not persuaded that we should overrule or disapprove such cases as *Key Western Life Ins. Co. v. State Board of Insurance,* 163 Tex. 11, 350 S.W.2d 839 (1961); *Lone Star Gas Co. v. Kelly,* 140 Tex. 15, 165 S.W.2d 446 (1942); *Housing Authority of City of Dallas v. Higginbotham,* 135 Tex. 158, 143 S.W.2d 79 (1940); *Martinez v. Texas State Board of Medical Examiners,* 476 S.W.2d 400 (Tex. Civ.App.1972, writ ref'd n.r.e.), *appeal dism.,* 409 U.S. 1020, 93 S.Ct. 463, 34 L.Ed.2d 312; *Commissioners Court of Lubbock County v. Martin,* 471 S.W.2d 100, 105 (Tex.Civ.App.1971, writ ref'd n.r.e.); *E.S.G. v. State,* 447 S.W.2d 225 (Tex.Civ.App.1969, writ ref'd n.r.e.).

Professor Davis concludes that the nondelegation doctrine in federal courts has been less than successful, but he would not abolish all standards. Davis, Administrative Law. Treatise, § 2.16 (1st ed. 1970). Instead, he would substitute administrative standards in the form of published rules and regulations for statutory standards. *See Trapp v. Shell Oil Co.,* 145 Tex. 323, 198 S.W.2d 424 (1947). We have, in this case, no standard or criteria either by statute or rule which affords safeguards for the affected parties.

### Unconstitutional Application

 The second basis for the trial court's judgment is that "the application of the Texas Antiquities Act, Article 6145–9, to these buildings is unconstitutional as applied." We agree with this conclusion. Since the Antiquities Committee is a state agency, the Antiquities Committee's application of section 6 of the Antiquities Code must be judged by the substantial evidence rule. *Railroad Commission v. Shupee,* 57 S.W.2d 295 (Tex.Civ.App.1933), *aff'd,* 123 Tex. 521, 73 S.W.2d 505 (1934). The substantial evidence rule demands that we hold section 6 unconstitutional as applied if the evidence is such that reasonable minds could not have reached the conclusion that the Antiquities Committee must have reached in order to justify its actions. *Trapp v. Shell Oil Co., supra ; [Railroad Comm.] TremCarr v. Shell Oil Co.,* 139 Tex. 66, 161 S.W.2d 1022 (1942). We hold that there is no substantial evidence in support of the action of the Antiquities Committee.

There are two reasons for this conclusion. This first one is. that a program to restore the buildings would compel the misuse of public funds that were obtained by approving a bond issue for educational purposes. The college delayed its contract for demolition so that those seeking to save the buildings might come forward with funds necessary to do so. If those funds had been available, the public school money would not have been needed. No source of funds for salvage and restoration is suggested by any of the witnesses, other than the school funds. The school funds were already dedicated and allocated to the College District's educational purposes. The testimony shows that the large sums of money required to restore the buildings would exhaust the College funds essential to its authorized educational purposes. Restoration of the buildings would also require the reconstruction of five times more space than is needed for educational purposes. The Antiquities Committee recognized this fact. A witness

for the Committee stated that funds might be granted by the National Park Service provided the buildings are usable, but not if they are simply restored to be exhibited as old buildings. An architect testifying for the Committee expressed the opinion that "the only source I know of for the money would be . . . the Community College . . . ." The President of the College said that the public would be considerably upset if it thought there was a possibility of diverting school funds to the restoration for non-educational purposes. Upon the basis of this kind of evidence from both those who favored and opposed the restoration of the buildings, the trial court quite properly concluded that the Act was unconstitutionally applied to a situation in which property and funds committed to a public trust for the benefit of the people in the school district would be arbitrarily diverted to a wholly different purpose.

The second reason for our decision is that the buildings are incapable of restoration except upon an unreasonable expenditure of money. The inferior materials used in the original construction of the buildings requires complete reconstruction from the foundation up and at a cost greater than original new construction. The engineering and architectural evidence is that the only way to bring the buildings up to code standards or to save them is to rebuild them. Even the foundations would have to be rebuilt. The cost of rebuilding all three buildings would be in excess of 10,500,000 dollars. There is danger of collapse of the outside walls if reconstruction is undertaken. Estimates for the cost of reconstruction range from thirty-five dollars to eighty-one dollars per square foot. One witness for the Antiquities Committee said that anything can be built if you construct a building out of money, but the reconstruction would cost more than new construction. He stated that the diversion of the College District's funds from education to the preservation of the three buildings presented an unsolvable conflict. Another witness for the Antiquities Committee suggested that the solution to the construction problem was to gut the buildings, use the facades as curtain walls, and put a new structural frame inside. Sandstone and brick have been falling from the buildings since 1967. Both the sandstone and the windowsills have now been purposely chiseled away from the outside of the buildings to avoid their falling on people in the streets below. Of three hundred core samples taken from the building, all came out as dust, chips, or loose bricks. The buildings have already outlasted by more than forty years the time for which they were designed. The exterior walls support the floor load. One building, eight stories high, uses wood columns. All three buildings are at least nine times below the code requirements.

The only use for the buildings suggested by the Antiquities Committee, even after the costly rebuilding would be as commercial office space. The buildings cannot be made usable for educational purposes. Classrooms with many occupants, books, and furniture would impose weight loads that the buildings could not bear even if restored. If usable as commercial rented space, there would be a continuing financial burden to the College District. For example, one building could be restored at a cost of 6,000,000 dollars and then rented for commercial purposes with a maximum return of no more than 2.98 percent. But leasing for business purposes would be difficult because the commercial offices would be in the midst of an inappropriate academic community. That part of downtown Dallas already has an eighteen to twenty percent vacancy rate for its buildings. From this record, there is no substantial evidence that the buildings, even after reconstruction and renovation could be usable for educational purposes.

The Antiquities Committee confronts the trial court's judgment with the contention that the College District, as a political subdivision of the state is subordinate to the powers of the Antiquities Committee; has no contract or property rights which are protectable against the Committee's superior powers. We need not in this case, decide which of two state agencies is charged with

the "higher" trust. In this case that question would cast the educational needs of the state's citizens against the preservation of the 1910 buildings described above. The Committee, relying upon the language of *Hunter v. Pittsburgh,* 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907), argues that "the State is supreme, and its legislative body . . . may do as it will, unrestrained by any provision of the Constitution of the United States." That expression of statism satisfies neither the protections of the United States Constitution or the Texas Constitution.

The United States Supreme Court has closely restricted *Hunter's* broad and loose language in *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). Justice Frankfurter, writing for the court in *Gomillion,* circumscribed its dicta by an analysis of the matters before the court in *Hunter* and wrote:

> In short, the cases that have come before this Court regarding legislation by States dealing with their political subdivisions fall into two classes: (1) those in which it is claimed that the State, by virtue of the prohibition against impairment of the obligation of contract (Art. I, § 10) and of the Due Process Clause of the Fourteenth Amendment, is without power to extinguish, or alter the boundaries of, an existing municipality; and (2) in which it is claimed that the State has no power to change the identity of a municipality whereby citizens of a pre-existing municipality suffer serious economic disadvantage. 364 U.S. 342–343, 81 S.Ct. 128.

In a society when so many rights are subject to the regulation of administrative agencies, *Gomillion* brought the "plenary power" doctrine of *Hunter* under appropriate limitations, stating:

> a correct reading of the seemingly unconfined dicta of *Hunter* and kindred cases is not that the State has plenary power to manipulate in every conceivable way, for every conceivable purpose, the affairs of its municipal corporations, but rather that the State's authority is unrestrained

by the particular prohibitions of the Constitution considered in those cases.

■ The Texas law has developed in a similar fashion. One agency of the state does not possess powers to divest vested property and contract rights of another state agency "unrestrained by the particular prohibitions of the Constitution." In *Milam County v. Bateman,* 54 Tex. 163 (1880), the legislature granted land to the county for public school purposes. Subsequently, the legislature took this land from the county and transferred it to private individuals. This court held that the legislature could not do this. The legislature's extensive control over its subdivisions' political rights was recognized, but it was held that a subdivision's property rights, "are protected by the same constitutional guarantees which shield the property of individuals." 54 Tex. at 166. *Milam County* went on to state that, "the purpose for which the property was originally acquired shall, as far as circumstances will admit, be kept in view; and that it shall not arbitrarily be diverted as in the case before us, to private parties and to a wholly different purpose." 54 Tex. at 166.

■ *Love v. City of Dallas,* 120 Tex. 351, 40 S.W.2d 20 (1931) faced the issue whether the legislature had plenary power over a school district's property and functions. The question in *Love* was whether a school district must, as the legislature had enacted, use its funds to educate non-residents of the local district. Writing for the court, Chief Justice Cureton rejected the idea that the legislature has plenary powers over its creature when the school district holds its property as trustee for the public. This court held, instead, that the school district's property must be used for the purposes for which it was acquired. This court stated that the school district:

> has no contract right to exist as a corporation, but the public that it represents has a vested right in the municipal property acquired for its benefit, and is entitled to demand that such property be applied to its uses. 40 S.W.2d at 27.

**931**

*Love* cited with approval the principle enunciated in 24 Ruling Case Law, *Schools* §§ 45–47 (1919), that school funds and property are trust funds for educational purposes; consequently, they should not:

> be diverted to other even though closely kindred uses, no matter how meritorious the project may appear to be either in its practical or ethical or sentimental aspects. Even the legislature, itself, the fountain head of matters educational, cannot divert school funds to other uses.

40 S.W.2d at 27.

Since the Antiquities Committee's application of section 6 diverts the buildings to uses other than educational purposes, *Love* demands that we hold section 6 unconstitutional as applied.

■ On the basis of the trial court's findings that section 6 of the Antiquities Code is both unconstitutional and unconstitutionally applied, we affirm the trial court judgment.

GREENHILL, C. J., concurs with an opinion.

DENTON, J., dissents in an opinion in which DANIEL, JOHNSON and YARBROUGH, JJ., join.

GREENHILL, Chief Justice, concurring.

I agree that the judgment of the trial court should be affirmed; and, therefore, I concur in the judgment of the Court.

It clearly appears to me that this particular determination of the Antiquities Committee is not supported by substantial evidence. Stated differently, for the reasons set out in the Court's opinion, the action of the Board is arbitrary and without a sound basis.

My conclusion is based on the application of the substantial evidence rule and not upon constitutional grounds. When a controversy may be resolved on a non-constitutional ground, then the court should rest its decision on that ground, and should not decide the constitutional questions presented. *Neese v. Southern Railway Co.,* 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955); *Peters v. Hobby,* 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129 (1955). I therefore, do not reach any constitutional question.

DENTON, Justice, dissenting.

I respectfully dissent. Four of my brothers hold that section six of the Antiquities Code is too vague, so it violates the Due Process Clause of both the State and Federal Constitutions. I disagree; the College District does not have standing to assert deprivation of property without due process, and under what I perceive as the proper scope of review in this case there exists no justiciable controversy.

My first disagreement with the plurality is in the application of the Fourteenth Amendment and Art. I, § 19 of the Texas Constitution:

> nor shall any State deprive *any person* of life, liberty, or property, without due process of law . . . .

U.S.Const. Amend. XIV, § 1.

> No *citizen* of this State shall be deprived of . . . property . . . except by due course of law . . . .

Tex.Const. Art. I, § 19. Essential to a holding that the College District has not been afforded due process is a holding that the District is a person, or a citizen. There exists no authority to support the holding, implicit in the plurality opinion, that the College District is a "person," and I can think of no rationale for such a holding.

The College District is a body politic, or political subdivision of the State of Texas, created pursuant to the legislative authority of article 2815h of the civil statutes. The College District is authorized to levy taxes, acquire title in its own name to real and personal property, and generally to administer such property for educational purposes. It is not given the right to vote, the freedoms of speech, press, and religion, the right to counsel, or any other right enjoyed by *people* under the Constitution. This is because a political subdivision is not now and never has been a "person" in any sense of the term. It was early established by this Court that a public political subdivision is merely an agent of the State in the

administration of its power. In *Bass v. Fontelroy*, 11 Tex. 698 (1854) the Legislature had repealed the charter of the City of Brownsville; the repeal was challenged as an unlawful taking of vested property rights without just compensation. Justice Lipscomb, denying the City's claim, stated that:

> The establishment of counties, their boundaries, courthouses, jails, bridges, ferries, are all matters of public policy, dependent on the legislative will for their creation; and . . . are equally dependent upon the same for their continued existence.

11 Tex. at 705. And in *Guadalupe County v. Wilson County*, 58 Tex. 228 (1882), the Legislature in creating Guadalupe County had taken portions of Wilson County without compensation. The ensuing boundary dispute was held a political question, resolved beyond judicial interference by the Act creating Guadalupe County and defining its boundaries to the exclusion of Wilson County. The agency concept of municipal corporation law was specifically relied upon in *City of Victoria v. Victoria County*, 100 Tex. 438, 101 S.W. 190 (1907), where this Court, in upholding a legislative transfer of title from the county to the city stated:

> The principle is that insofar as a corporation strictly municipal or quasi-municipal holds property for the purposes of government, it holds merely as a governmental agency, and it is within the power of the Legislature of the State to confer that agency upon some other proper governmental instrumentality.

100 Tex. at 451, 101 S.W. at 196. See also, Herget, *The Missing Power of Local Government*, 62 Va.L.Rev. 999 (1976).

Decisions of the United States Supreme Court establish that political subdivisions, as agencies of the State in the exercise of governmental powers, have no rights assertible under the Federal Constitution against the State. The famous case of *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819), established that public corporations, as distinguished from private business corporations, enjoy no protection assertible under the contract clause of the Federal Constitution against legislative alteration of organic charters. See Campbell, *John Marshall, The Virginia Political Economy, and the* Dartmouth College *Decision*, 19 Am.J.Legal Hist. 40 (1975). Cases following *Dartmouth College* have reiterated that the charter of a political subdivision, being a mere delegation of State authority, is subject to alteration or revocation at the will of the Legislature. *Hunter v. City of Pittsburgh*, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907); *Covington v. Kentucky*, 173 U.S. 231, 19 S.Ct. 383, 43 L.Ed. 679 (1899); *Meriwether v. Garrett*, 102 U.S. 472, 26 L.Ed. 197 (1880); *East Hartford v. Hartford Bridge Co.*, 51 U.S. (10 How.) 511, 13 L.Ed. 518 (1850). A municipality thus was denied the power to assert denial of due process of law in *City of Trenton v. New Jersey*, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923). And Mr. Justice Cardozo in *Williams v. Mayor of Baltimore*, 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed. 1015 (1933) made it clear that no protection is offered a political subdivision by the Fourteenth Amendment. To the Supreme Court, a political subdivision simply is not a person; and is not, therefore, entitled to due process. See Schulz, *The Effect of the Contract Clause and the Fourteenth Amendment upon the Power of the States to Control Municipal Corporations*, 36 Mich.L.Rev. 385 (1938).

The plurality cites *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) as providing the necessary exception to the rule. In that case voters, that is *People* of Tuskeegee, Alabama argued that a legislative redistricting of the city deprived them of the voting rights under the Fifteenth Amendment. There were no "rights" of the city, a political subdivision, before the Court. The plurality quote the following from the *Gomillion* opinion:

> [A] *correct reading* of the seemingly unconfined dicta of Hunter and kindred cases is . . . that the *State's authority is unrestrained by the particular prohibitions of the Constitution considered in those cases.*

364 U.S. at 344, 81 S.Ct. at 128 (emphasis mine). As stated above, *City of Trenton v. New Jersey* and *Williams v. Mayor of Baltimore, supra,* two of "those cases" referred to in *Gomillion,* involved claims under the Fourteenth Amendment. To reiterate, *Gomillion* involved the rights of *private persons*; it has no application to the controversy at hand. The plurality cite no case in which a political subdivision has been held entitled to due process and there is none.

This Court has, on two occasions, enunciated the *proper* scope of judicial review over legislative control of political subdivisions. Far from holding that political subdivisions are entitled to due process of law, this Court has stated that the *only* protection is against *arbitrary* diversion of property held by political subdivisions in such a fashion that the public would be deprived of the use of such property. The only judicial question is arbitrariness *vel non* of the legislative action.

In *Milam County v. Bateman,* 54 Tex. 163 (1880), the Court commented:

Counties in their relation toward the state may be viewed in a two-fold aspect: one, which pertains to their political rights and privileges; the other, to their rights of property.

54 Tex. at 165. Concerning "political rights and privileges," including the right of organic existence, the Court noted that a county has no assertible rights against the State; the latter was said to be in complete control. Different considerations were deemed applicable as to "rights of property."

A different principle, however, obtains as regards the rights of counties to property which they may acquire.

. . . . .

If given for a specific object, the state may very properly, as in the instance under consideration of our school lands

granted to counties, exercise such supervision and control over the actions of the counties as to compel the proper execution of the trust, or prevent its being defeated; but it is believed that this control, unless by consent of the county, should be subject to the restriction, that *the purpose for which the property was originally acquired shall,* as far as circumstances will admit, *be kept in view*; and that *it shall not arbitrarily be diverted . . . to private parties* and to a wholly different purpose.

54 Tex. at 165–66 (emphasis mine).

The quoted portions of the *Milam County* opinion were genesis to this Court's consideration of legislative power in *Love v. City of Dallas,* 120 Tex. 351, 40 S.W.2d 20 (1931). In *Love* the Court was concerned with whether the Legislature could impose upon the City the obligation to employ City funds for the education of nonresident children. It was determined that such an imposition would violate Tex.Const. Art. VII, § 3, in that it would divert special school funds.* In spite of such holding the Court went on to discuss the legislative power over its subdivisions in general:

The rule is that the ownership of [local government] property is in the local district or municipality for the benefit of the public, within the boundaries of the district or municipality. *The Legislature may control or dispose of the property without the consent of the local bodies, so long as it does not apply it in contravention of the trust.*

120 Tex. at 367, 40 S.W.2d at 27 (emphasis mine).

The limitations upon legislative power in *Milam County* and *Love* are founded upon sound reason. Local government property is, in principle and in fact, trust *res* conveniently held and managed by local officials for the benefit of the local public. Where,

---

* The Court stated:

Since the Constitution, art. 7, sec. 3, contemplates that districts shall be organized and taxes levied for the education of scholastics within the districts, it is obvious that the education of nonresident scholastics is not within their ordinary functions as quasi-municipal corporations; and under the authorities cited the Legislature is without power to impose such an obligation on them, without just compensation.

120 Tex. at 367, 40 S.W.2d at 27.

as here, such property has been acquired with governmental funds pursuant to specific approval of the local voting public, there arises special reason for enforcing the trust; justifiably, the public has a reliance interest in the disposition of property acquired for and devoted to a designated use. *Milam County* instructs the Legislature in its supervision of local government property to keep in view "the purpose for which the property was originally acquired," and prohibits arbitrary diversion to a "wholly different purpose." *Love* goes further to say that Legislative power over local government property is regulatory only; while the *entity* is subject to legislative destruction, the property held by that entity remains in the public trust. On the other hand, neither *Milam County* nor *Love* can be considered authority for the proposition that local government entities have judicial standing to challenge legislative regulation of property in the same manner or to the same degree as owners of private property. The judicial touchstone is arbitrariness. *Management* of property held in the public trust is a matter of legislative concern. *Cf.,* Note, *Proprietary Duties of the Federal Government Under the Public Land Trust,* 75 Mich.L.Rev. 586, 592–94 (1977).

Turning now specifically to section six of the Antiquities Code, it becomes apparent to me that it effects no diversion of College District property in a manner prohibited by *Milam County* and *Love.* The mere fact that "State archeological landmarks" are declared to be the "sole property of the State" gives rise to no justiciable complaint on the part of the local government entity in which title was theretofore reposed. The interest protected by *Milam County* and *Love* is the public's interest in use of the property, not the local entity's interest in nominative title. Change in nominative title effects no change in use. The nominative title to public property is a patently political matter to which the words of Justice Bonner in *Milam County* are peculiarly applicable: "If [the State] could not exercise such power over the delegated political rights and privileges of . . . subdivisions of state governmental authority, we

might have a system of petty discordant governments within a government, without unity of design or action." 54 Tex. at 165. See also *Chester County Institution District v. Commonwealth,* 341 Pa. 49, 17 A.2d 212 (1941). And although the grant of power to the Antiquities Committee to prohibit or regulate alteration, damage or destruction of an "archeological landmark" indirectly might effectuate some change in a use, the legislative decision to vest power to make that change in a committee of seven experts cannot be considered arbitrary. It is as I have said, only arbitrary regulation of local government property which gives rise to a justiciable interest on the part of local government officials. In the instant case, the College District claims that the buildings cannot compatibly be used for both educational and cultural (historical preservation) purposes. It might indeed be a justifiable implication from the Antiquities Committee's action that the educational function of the College District would be promoted rather than impaired by the requirement that the cultural integrity of school buildings be maintained. But making such an implication is not a judicial function. It is not the duty of the courts in a case of this nature to view structures, deemed by one State agency as culturally insignificant and by another as worthy of preservation, and decide which is in the right. This is especially true where the Legislature has granted the other the power to preserve without granting the one the right to question. *Firemen's & Policemen's Civil Service Comm'n v. Kennedy,* 514 S.W.2d 237 (Tex.1974). The Legislature, in section six of the Antiquities Code, has delegated authority to the Antiquities Committee to protect that which it deems worthy of protection. The Antiquities Committee is made a final checkpoint prior to possible effacement of property deemed by the Legislature to be of intangible value. The legislative decision that property held by its political subdivisions may not be altered when such alteration would efface the property's historical integrity is not a decision with which the courts should interfere. If

the plurality intends to hold, under *Love v. City of Dallas* that historical preservation is such a wholly incompatible use of property acquired for educational purposes so as to constitute an unlawful diversion of a public trust, it would be difficult to discern any situation in which historical preservation would *not* be antipathetic to the public trust. I can see no operative distinction between property acquired for educational purposes and property acquired for, say, a City Hall, a courthouse or a park. Indeed, such a holding is tantamount to a judicial declaration that *no* property held by a political subdivision can be protected under the legislative banner of historical preservation unless the property *originally* was acquired for its aesthetic characteristics, or unless the Legislature takes the property by exercise of eminent domain. I would hold that restriction of the use of College District property in order to protect that property's aesthetic integrity does not deprive the local public of the benefit of the property to the degree prohibited by *Love* and *Milam County*. In imposing a higher, general trust upon property held by political subdivisions in the public trust, the Legislature acted within its authority. When such is the case, the remedy lies in the legislative process, not in the courts. See Henkin, *Is There a "Political Question" Doctrine?* 85 Yale L.J. 597 (1976). This is a dispute between different departments of the same branch of government. The "boss" of that branch, the Legislature, has decided that one department's power exceeds the other's. As long as no specific constitutional provision is violated, and absent arbitrary legislative action, the courts cannot and should not interfere with the manner in which the Legislature conducts its affairs.

I would not in this case reach the questions of vagueness discussed by four members of the Court. Such questions should, and will be raised at such time as this Court is faced with governmental interference with *private* property under the banner of historical preservation. But in reply I do point out that this Court very recently stated that the protection of cultural property may indeed be a *duty* of the Legislature.

*San Antonio Conservation Soc'y, Inc. v. City of San Antonio*, 455 S.W.2d 743, 748 (1970). Not every historical structure worthy of protection can be an Alamo; vagueness in describing cultural property may to a degree be an inherent difficulty.

I would reverse the district court's judgment and dissolve the injunction.

DANIEL, JOHNSON and YARBROUGH, JJ., join in this dissent.