

## Office of the Attorney General
## State of Texas

**DAN MORALES**
ATTORNEY GENERAL

January 10, 1995

Ms. Rebecca Lightsey
Interim Commissioner of Insurance
Texas Department of Insurance
P.O. Box 149104
Austin, Texas 78714-9104

Opinion No. DM-314

Re: Whether the Department of Insurance may, pursuant to Insurance Code article 3.50-6A, license noninsurance entities that offer viatical settlement agreements, and related questions   (RQ-663)

Dear Ms. Lightsey:

Your predecessor in office asked us four questions about Insurance Code ("code") article 3.50-6A:

> 1.   Does article 3.50-6A authorize the Department of Insurance (the "department") to license noninsurance entities that offer viatical settlement agreements?
>
> 2.   If the answer to the first question is affirmative, does article 3.50-6A authorize the department to charge a fee for such a license?
>
> 3.   Does article 3.50-6A authorize the commissioner of insurance to enforce, through the sanctions provided in code article 1.10, subsection 7(a),[1] rules the department would adopt under article 3.50-6A?
>
> 4.   If the answer to the third question is negative, does article 3.50-6A authorize the department to report to the attorney general violations of rules promulgated under article 3.50-6A and to request that the attorney general file suit to enforce such rules?

All four questions assume as a threshold matter that article 3.50-6A validly delegates authority to the department to regulate viatical settlements. For the following reasons, we are of the opinion that article 3.50-6A is invalid as an unconstitutional

---

[1]Subsection 7(a) authorizes the commissioner of insurance to order sanctions against "the holder or possessor of" a "permit, license, certificate of authority, certificate of registration, or other authorization issued or existing under [the Commissioner's] authority or the authorization of th[e Insurance] Code."

delegation of regulatory authority and therefore that the department has no authority under this statute to regulate viatical settlements.

The concept of a viatical[2] settlement agreement

> is simple but controversial: An investor buys the life insurance policy of someone with AIDS for less than the face value, becomes the beneficiary and makes money when the person dies.
>
> In return, the AIDS sufferer receives a large amount of cash-- usually 50 to 80 percent of the policy depending on his or her life expectancy--to pay off debts or just enjoy.

Housewright, *supra* note 2. "The viatical industry got started in 1989 because of AIDS, although people with terminal illness such as cancer are also selling their policies." Leigh Hopper, *AIDS Sufferers Swap Insurance for Ready Cash*, HOUSTON POST, Apr. 1, 1994, at A1, A15; *cf.* Miller, *supra* note 2 ("The first viatical company appeared in 1988"). Cancer patients make up only ten percent of those now selling their policies but are expected to become a majority in the near future. Quint, *supra* note 2, at C1, C2. Some viatical companies buy and hold policies, and others "are brokers that find buyers and receive a fee for their service." Housewright, *supra* note 2.

Article 3.50-6A, which was added to the code in the last legislative session, *see* Acts 1993, 73d Leg., ch. 918, provides as follows:

### Definitions

Sec. 1. In this article, "viatical settlement" means a contract, entered into by an insured with a terminal illness who owns a life insurance policy insuring the life of the insured, under which the insured assigns or transfers the insurance policy to another person or entity for valuable consideration.

### Regulation by Board

Sec. 2. The board has exclusive jurisdiction in this state to regulate viatical settlements, regardless of form, other than transactions governed by The Securities Act (Article 581-1 et seq., Vernon's Texas Civil Statutes).

---

[2]*Viatical* derives from the Latin word *viaticum*, which referred to "the money and supplies given to Roman officials before risky journeys to far-flung regions of the empire." Michael Quint, *Pre-Death Cash: A Business Grows*, N.Y. TIMES, Nov. 14, 1994, at C1. Viatical settlements sometimes are called "living benefits," Ed Housewright, *Investors' Purchase of AIDS Patients' Insurance Policies Raises Ethical Questions*, DALLAS MORNING NEWS, Feb. 7, 1994, at A1, or "death futures," Mark Miller, *Taking on "Death Futures,"* NEWSWEEK, Mar. 21, 1994, at 54.

The department is the "board" to which article 3.50-6A refers. *See* Ins. Code art. 1.01A(c).

It is settled law in this state that "some criteria or safeguards" are necessary to the valid delegation of legislative power to administrative agencies. *Texas Antiquities Comm. v. Dallas County Community College Dist.*, 554 S.W.2d 924, 927 (Tex. 1977) (plurality opinion). The "criteria or safeguards" do not have to be found in the statutory delegation, however: the separation of powers required by section 1 of article II of the Texas Constitution[3] does not forbid that an administrative agency itself make rules establishing standards to guide its exercise of power in effectuation of the legislative purpose, provided that the rules are made pursuant to power delegated by the legislature and in accordance with procedures that protect the rights of persons affected by the exercise of regulatory discretion. *See Trapp v. Shell Oil Co.*, 198 S.W.2d 424, 438-39 (Tex. 1946) (on motion for rehearing); *see also Texas Antiquities Comm.*, 554 S.W.2d at 928 (plurality opinion) ("We have, in this case, no standard or criteria either by statute or rule which affords safeguards for the affected parties"). Thus, to constitute a valid delegation of legislative power, an organic statute that lacks meaningful standards must at least have a discernible general regulatory purpose. *See Trapp*, 198 S.W.2d at 438; *see also* 1 KENNETH C. DAVIS, ADMINISTRATIVE LAW TREATISE § 3:15, at 209 (2d ed. 1978) ("a delegation *without standards* of power to make rules in accordance with proper rule-making procedure and a delegation *without standards* of power to work out policy through case-to-case adjudication based on trial-type hearings should normally be sustained, *whenever the general legislative purpose is discernible*") (last emphasis added). The legislature must set the public policy of the state, and the agency must exercise its delegated rulemaking power within the limits of the primary standards prescribed by the legislature or implicit in the public policy. *See Brown v. Humble Oil & Refining Co.*, 83 S.W.2d 935, 940-41 (Tex. 1935). Analyzing under these principles, we find that article 3.50-6A has neither standards nor a discernible regulatory purpose.

Article 3.50-6A does not express any standards or guidelines for regulation, nor can we infer from reading the article *in pari materia* with the rest of the code any legislative intent as to such standards or guidelines. *Cf. Carlson v. Landon*, 342 U.S. 524, 544 (1952) (holding that Internal Security Act of 1950 was not unconstitutional delegation of rulemaking authority because other statutes provided standards for determining what aliens were subject to deportation and thus limited attorney general's

---

[3]Section 1 of article II provides as follows:

Section 1. The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one, those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

authority under Internal Security Act of 1950 to detain such aliens without bail pending deportation proceeding).   For instance, we cannot read code article 1.10A, which authorizes the commissioner of insurance to issue a cease and desist order in certain circumstances against a person "engaging in the business of insurance," as being applicable to a viatical company unless that company in fact engages in some act in Texas that constitutes the business of insurance as defined in code article 1.14-1.[4]  The same is true of code article 21.21, which prohibits certain "unfair methods of competition or unfair or deceptive acts or practices [in the business of insurance]."

---

[4]Code article 1.14-1 defines "insurance business" in part as follows:

1. The making of or proposing to make, as an insurer, an insurance contract.

2. The making of or proposing to make, as guarantor or surety, any contract of guaranty or suretyship as a vocation and not merely incidental to any other legitimate business or activity of the guarantor or surety.

3. The taking or receiving of any application for insurance.

4. The receiving or collection of any premium, commission, membership fees, assessments, dues or other consideration for any insurance or any part thereof.

5. The issuance or delivery of contracts of insurance to residents of this state or to persons authorized to do business in this state.

6. Directly or indirectly acting as an agent for or otherwise representing or aiding on behalf of another any person or insurer in the solicitation, negotiation, procurement or effectuation of insurance or renewals thereof or in the dissemination of information as to coverage or rates, or forwarding of applications, or delivery of policies or contracts, or inspection of risks, a fixing [sic] of rates or investigation or adjustment of claims or losses or in the transaction of matters subsequent to effectuation of the contract and arising out of it, or in any other manner representing or assisting a person or insurer in the transaction of insurance with respect to subjects of insurance resident, located or to be performed in this state. . . .

7. Contracting to provide indemnification or expense reimbursement in this state to persons domiciled in this state or for risks located in this state . . . .

8. The doing of any kind of insurance business specifically recognized as constituting the doing of an insurance business within the meaning of the statutes relating to insurance.

9. The doing or proposing to do any insurance business in substance equivalent to any of the foregoing in a manner designed to evade the provisions of the statutes.

10. Any other transactions of business in this state by an insurer.

Ins. Code art. 1.14-1, § 2(a).  You do not cite, nor have we found, any provision in the code predating article 3.50-6A that would authorize the licensure of companies to engage in viatical services.

Furthermore, there is no well-established case law, administrative practice, or background of custom that the legislature could have intended the department to rely on as standards of practice or policy guidelines for the infant viatical industry. We have found in our research no reported case dealing with viatical settlements.[5] The department has no existing regulatory scheme with crystallized standards of practice that the legislature could have intended to extend to viatical settlements. *Cf. Kent v. Dulles*, 357 U.S. 116, 127-28 (1958) (administrative practice prior to enactment of standardless statute granting secretary of state discretion to grant passports had crystallized into two grounds for passport denial, citizenship [or allegiance] and unlawful conduct, which were "the only ones which it could fairly be argued were adopted by Congress in light of prior administrative practice").

Compare the legislative delegation of regulatory power in *Fahey v. Mallonee*, 332 U.S. 245 (1947), where a statute authorized the Federal Home Loan Bank Board to regulate "the reorganization, consolidation, merger, or liquidation of [building and loan] associations," with "the power to appoint a conservator or receiver to take charge of the affairs of any such association." *Id.* at 249. The Court there held that the statute was a constitutionally valid delegation of legislative functions, despite its lack of standards, because banking was a long-regulated industry with "well-defined practices" for appointment of conservators and receivers and the courts had "many precedents" in the field of corporate management that had "crystallized into well-known and generally acceptable standards." *Id.* at 250. Article 3.50-6A, unlike the statute in *Fahey*, cannot be construed as conforming to constitutionally permissible "well-known and generally acceptable standards" that would limit the department's rulemaking discretion." *Id.*

Article 3.50-6A lacks even a discernible legislative purpose for the delegation of regulatory power. One author opines in the following words that exactitude should not be a requirement for the expression of regulatory purpose:

> When the legislative draftsmen decide upon the terms of the delegation, it is for them to decide whether the legislature shall set the policy in definitive terms, or whether on the other hand the legislative enactment shall express its general purpose only in terms of a pious wish, delegating to an administrative agency the responsibility of actually determining the working policies by which the generally-phrased legislative desire should be attained.

FRANK E. COOPER, STATE ADMINISTRATIVE LAW 71 (1965). We need not consider here how precise an expression of regulatory purpose must be to pass muster under the Texas

---

[5]Only a handful of states have laws regulating the industry. Ernest Sander, *Grim Reapers*, AUSTIN AMERICAN-STATESMAN, May 1, 1994, at J1, J6 (listing California, Indiana, Kansas, New Mexico, and New York). Early last year the National Association of Insurance Commissioners adopted model legislation for state regulation of viatical settlements. *See id.* Viatical Settlements Model Act (Nat'l Ass'n of Ins. Comm'rs 1994).

Constitution, for article 3.50-6A lacks the expression of even a "pious wish" or "generally-phrased legislative desire." Compare the legislative purpose in the statutory delegation upheld in the *Trapp* case: "for the conservation of crude petroleum oil and natural gas and to prevent the waste thereof." V.T.C.S. art. 6029, *repealed by* Acts 1977, 65th Leg., ch. 871, art. I, § 2(a)(2); *see Trapp*, 198 S.W.2d at 438. There is no discernible implication of legislative purpose from the statute's expression of "viatical settlements" as the subject matter to be regulated.

Finally, we do not find in the legislative history of article 3.50-6A any statement of the legislature's objective for regulation by the department. Furthermore, the House Committee on Insurance's analysis for the Seventy-third Legislature's House Bill 431, which added article 3.50-6A to the code, *see* Acts 1993, 73d Leg., ch. 918, provides, surprisingly, "It is the opinion of this committee that this bill does not confer rulemaking authority to a state officer, agency, department or institution." House Comm. on Insurance, Bill Analysis, H.B. 431, 73d Leg. (1993). In the House Research Organization analysis of the House Bill 431 unnamed "other opponents" of the bill are cited for the following arguments:

> Unless regulated correctly, unscrupulous viatical settlement operators could prey upon physically or mentally vulnerable and financially desperate individuals. HB 431 should contain specific direction to TDI to ensure the protection of consumers, such as regulations that would require consumers to seek legal counsel, operators to offer tax advice and to discuss viatical settlement options and the establishment of a waiting period for the insured to reconsider a sale.

> Acceptable fee schedules for viatical settlement brokers and agents should also be implemented to ensure against high profits made at the expense of the terminally ill. Currently, a wide range of fees and expenses are charged for the arrangement of viatical settlements.

House Research Organization, Bill Analysis, H.B. 431, 73d Leg., at 3 (1993). Any or all of the objectives that the "other opponents" allude to above--prohibiting unscrupulous practices; preventing the exploitation of weak, desperate, or incompetent insureds; requiring that the decision to sell one's life insurance policy be an informed one; controlling investors' profits--*may* have been intended by the legislators to be incorporated within the article 3.50-6A's textually empty delegation of authority "to regulate viatical settlements." Any of these objectives would have served to give purport to the delegation of regulatory power if there had been an expression in the legislative history of such objectives as the sense of the lawmakers. Unfortunately, there is no such expression. Rather, the purpose of House Bill 431 as stated in the House Committee on Insurance's bill analysis, "to clearly establish the jurisdiction of the State Board of Insurance over the regulation of viatical settlements," adds no substance to the needed regulatory objective.

We believe the nondelegation doctrine requires that a valid delegation of administrative regulatory power contain either in the text or in the legislative history of the organic statute a discernible legislative regulatory objective. *See Trapp*, 198 S.W.2d at 438; 1 DAVIS, *supra* p. 3. A court may not assume the function of formulating an objective upon which to limit the scope of regulatory power under article 3.50-6A. Such judicial legislation to formulate regulatory policy would constitute an invasion of a nondelegable responsibility of representative government, *see* Stephen Koslow, *Standardless Administrative Adjudication*, 22 ADMIN. L. REV. 407, 420 (1961), as well as a function for which the court may not be institutionally equipped:

> In a representative democracy, regulatory policy is likely to be the product of compromise among a multitude of conflicting interests and views which find a voice in the legislative process. Logic and legal analysis, touchstones of the judicial process, so far as relevant at all in the work of legislative bodies, play a distinctly subordinate role. Courts cannot succeed in simulating that feature of the legislative process in the fashioning of regulatory goals unless they are willing openly to assume the role of legislators.

*Id.* at 420-21. Article 3.50-6A is a good example of a statute that purports to regulate a matter (viatical settlements) involving conflicting interests (persons with terminal illnesses, viatical companies, investors). Although this statute ought to voice some compromise among the conflicting interests in the form of a discernible objective, it in fact is mute.

Because there are no standards and no discernible legislative purpose in the delegation of regulatory authority in article 3.50-6A, we must conclude that the statute violates the separation of powers principle of the Texas Constitution. *See* Tex. Const. art. II, § 1; *cf.* Attorney General Opinion JM-1134 (1990) at 4 (statute granting Texas Racing Commission authority to regulate non-pari-mutuel racetracks was unconstitutional delegation of legislative power). Article 3.50-6A therefore is null and void.

## S U M M A R Y

Article 3.50-6A of the Insurance Code is null and void because it violates the separation of powers required by section 1 of article II of the Texas Constitution in that it provides neither standards nor a discernible objective in its delegation of regulatory authority to the Department of Insurance.

Yours very truly,

DAN MORALES
Attorney General of Texas

JORGE VEGA
First Assistant Attorney General

SARAH J. SHIRLEY
Chair, Opinion Committee

Prepared by James B. Pinson
Assistant Attorney General