**Opinion issued August 22, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

NO. 01-16-00847-CV

————————————

**ADAN G. ADAME, ROBERT H. ARISPE, HARVEY EDWARD ARNOLD, HERMON HARVEY ARNOLD, LUCIANO BARRIENTEZ, HOMER L. BATCHELOR, TOMAS BENITEZ, DELBERT RAY BLUNDELL, MELVIN BRIONES, TROY BRITT, RAYMOND H. BUTTERFIELD, GUADALUPE CALVO JR., RICHARD F. CAPSON, MERCEDES CASTILLO, IGNACIO CAVAZOS, HECTOR A. CHAPA, HUMBERTO CHAPA, REX CICERO, PALFREY COLLINS, GLENN COURMIER, EDDIE M. CROSS, FRANCISCO DABDUB, CAROL GENE DABNEY, STEVE DAVIS, NOE DE LA CRUZ, JOSE G. DELAPAZ, JOSE DUENES, JESSIE DUNCAN, RUDY ENCINAS, JOSE ESQUIVEL, JOSE T. FAJARDO, BENJAMIN D. FIELDS, FRANK FRANCO, JESUS CANTU GARCIA JR., PABLO G. GARCIA SR., MICHAEL GARY, ALONZO GARZA, HERMILO GARZA SR., HOMERO GARZA, OSCAR GARZA JR., PAUL D. GAWLIK, MANUEL B. GONZALES, BACILIO M. GUZMAN, CHESTER HARRINGTON, NORRIS G. HAWLEY, GERALD HENRY, JOSE A. HERNANDEZ, RIGOBERTO HERNANDEZ, C. DELL HODGE JR., DAVID HOLLINGSWORTH, KENNETH W. HOUFF, ELMER JAMISON, RONNIE L. JOHNSON, CURTIS JONES, JOE KOENIG, ELIAS LEAL, ROBERT LEMOS, JOSE G. LONGORIA, ANTONIO LOPEZ, CELSO LOPEZ, ARRON LUKE, GEORGE MCFARLAND, ERNEST MECHELL, ROBERT MECHELL, JOSE MEZA, CLYDE T. MILLER, KEITH**

MOORE, JUAN MORALES, TOMAS MORIN, ADALBERTO MUNIZ, DANIEL NAVEJAR, ESTEBAN NIETO, DANIEL OCHOA, MARCOS ORTIZ, JIMMY PATTERSON, MANUEL C. PAZ SR., ROBERTO PAZ, JUAN R. PEREZ, OSCAR PEREZ, VICTOR C. PEREZ, CARL PRENTICE, RENE R. RAMIREZ, RAY CHARLES REDMON, BILLY W. RICHARDSON, JOSE RIOS, FLOYD H. RODGERS, JOSE Z. ROJAS, GEORGE SAENZ, HECTOR SALAZAR, GUADALUPE C. SERNA, JESUS SOLIZ, HOWARD LEROY SPEARS, ROGER SPENCER, CARROLL G. STARKS, WILLIAM T. TERRAL, CURTIS THOMAS, MARTIN TORRES, TEODORO TOVAR, JOSE LUIS URESTI, ENRIQUE G. VILLARREAL JR., CLIFTON WEITZEL, ROBERT F. WEITZEL, JOSEPH H. WHEELER, JAY C. WHITLOCK, HERBERT WHITMIRE, and ABELARDO ZAMBRANO, Appellants

V.

3M COMPANY F/K/A MINNESOTA MINING AND MANUFACTURING COMPANY; AEARO COMPANY; AIR EQUIPMENT & REPAIR, INC.; AIR LIQUIDE AMERICA L.P.; AIRTROL SUPPLY, INC.; ALAMO CEMENT COMPANY; AMCOL INTERNATIONAL CORPORATION; AMERICAN COLLOID COMPANY; AMERICAN OPTICAL CORPORATION; AMF INCORPORATED & MINSTAR, INC.; ASHLAND CHEMICAL, INC.; BACOU-DALLOZ SAFETY, INC. F/K/A DALLOZ SAFETY, INC. F/K/A WGM SAFETY CORPORATION D/B/A WILLSON SAFETY PRODUCTS; BARRETTS MINERALS INC.; BARRY & BARRY SAND COMPANY, INC.; BLACK & DECKER (U.S.), INC.; BOB SCHMIDT, INC.; BONDO CORPORATION; CEL INDUSTRIES, INC.; CENTRAL READY MIX CONCRETE; CHEVRON U.S.A. INC. F/K/A GULF OIL; CHICAGO PNEUMATIC, INC.; CITGO PETROLEUM CORPORATION; CITGO REFINING AND CHEMICALS COMPANY, L.P.; CLEMCO INDUSTRIES CORPORATION HANSON AGGREGATES LLC SUCCESSOR BY MERGER TO PIONEER INTERNATIONAL (USA), INC. SUCCESSOR BY MERGER TO HANSON AGGREGATES, INC. F/K/A HANSON AGGREGATES CENTRAL, INC. F/K/A PIONEER SOUTH CENTRAL, INC. F/K/A PIONEER CONCRETE OF TEXAS, INC.; CORPUS CHRISTI EQUIPMENT COMPANY; DEVILBISS OR THE DEVILBISS COMPANY (SOMETIMES NAMED AS RANSBURG CORPORATION, ITW FINISHING LLC OR ILLINOIS TOOL WORKS INC.); E. I. DU PONT DE NEMOURS; E.D. BULLARD COMPANY, INC.; EASTERN SAFETY EQUIPMENT CO., INC.; EL PASO SAND &

2

TRUCKING; EMPIRE ABRASIVE EQUIPMENT COMPANY, L.P.; EMPIRE ABRASIVE EQUIPMENT CORPORATION; ENCON SAFETY PRODUCTS, INC.; ESPEY SILICA SAND COMPANY, INC.; FAIRMOUNT MINERALS, LTD.; FERRO ENGINEERING DIVISION OF ON MARINE SERVICES; FLEX-KLEEN; FLEXO PRODUCTS, INC.; GARDNER DENVER, INC.; GENERAL PATTERN COMPANY (SUCCESSOR-BY-MERGER TO GENERAL FOUNDRY PRODUCTS CORP.); GLENDALE TECHNOLOGIES, INC.; GRANITE CITY TOOLS; HAMILTON SUNDSTRAND; HANSON AGGREGATES WEST, INC.; HEXION INC. F/K/A MOMENTIVE SPECIALTY CHEMICALS F/K/A HEXION SPECIALTY CHEMICALS, INC. AND F/K/A BORDEN CHEMICAL, INC.; HUMBLE SAND & GRAVEL, INC.; IDEAL BASIC INDUSTRIES, INC.; INDUSTRIAL HOLDINGS CORPORATION F/K/A THE CARBORUNDUM COMPANY; INGERSOLL-RAND COMPANY; JOBE CONCRETE PRODUCTS; KELCO SALES & ENGINEERING CO., A DIVISION OF POLLEY, INC.; KEY HOUSTON, A DIVISION OF JACKSONVILLE SHIPYARDS, INC.; KEY HOUSTON, INC., A DIVISION OF JACKSONVILLE SHIPYARDS, INC.; LOCKHEED MARTIN CORPORATION; LOGAN & WHALEY COMPANY; LONE STAR INDUSTRIES, INC.; LOUIS M. GERSON COMPANY, INC.; MARTINDALE ELECTRIC COMPANY; MILTON ROY; MINE SAFETY APPLIANCES; MISSISSIPPI VALLEY SILICA COMPANY, INC.; MOLDEX-METRIC, INC.; NORCROSS; NORTH SAFETY PRODUCTS; OGLEBAY NORTON; P.K. LINDSAY COMPANY; PANGBORN CORPORATION; PARMELEE INDUSTRIES, INC.; PAULI & GRIFFIN COMPANY; PORTER WARNER INDUSTRIES, INC.; PREMIER REFRACTORIES, INC., IMPROPERLY NAMED AND SERVED AS AMERICAN PREMIER, INC. F/K/A PREMIER REFRACTORIES AND CHEMICALS, INC.; PROTECH COATINGS, INC. F/K/A FOUNDRY SPECIALTIES, INC.; PULMOSAN SAFETY EQUIPMENT CORPORATION; QUIKRETE; RACAL HEALTH AND SAFETY, INC.; RUEMELIN IN RECEIVERSHIP; SABINE PROPELLER & MARINE SERVICE COMPANY; SAINT-GOBAIN ABRASIVES, INC., F/K/A NORTON COMPANY; SCHRAMM, INC.; SCOTT TECHNOLOGIES, INC.; SHREVEPORT RUBBER AND GASKET; SIEBE NORTH; SILICA PRODUCTS, INC.; SLY, INC. F/K/A W. W. SLY MANUFACTURING CO.; SOUTHERN SILICA OF LOUISIANA, INC.; SPECIALTY MINERALS INC.; SPECIALTY SAND COMPANY; SPENCE CONCRETE COMPANY

3

**SULLAIR, LLC; SUNDYNE; SURVIVAIR, A DIVISION OF U.S.D. CORPORATION; SURVIVAIR, INC.; TECHNISAND, INC.; TEXAS GASKET; TEXTRON INC.; THE DOW CHEMICAL COMPANY; THE EASTWOOD GROUP INC. D/B/A THE EASTWOOD COMPANY; THE GOODYEAR RUBBER AND TIRE COMPANY; THE HILL AND GRIFFITH COMPANY; THE MORIE COMPANY; THORSTENBERG MATERIALS CO., INC.; TIDE-AIR; TRIANGLE SUPPLY; TRIPLEX, INC.; TRUMAN'S INC.; TWENTIETH CENTURY FOX FILM CORPORATION; TXI OPERATIONS, LP; TYROLIT NORTH AMERICA INC.; U.S. SILICA COMPANY, FORMERLY KNOWN AS PENNSYLVANIA GLASS SAND CORPORATION AND SUCCESSOR IN INTEREST THOUGH MERGER TO OTTAWA SILICA COMPANY; UNIMIN CORPORATION; UNION CARBIDE CORPORATION; VALERO ENERGY CORPORATION; VALLEN CORPORATION; VESUVIUS USA CORPORATION; VULCAN MATERIALS COMPANY; WEDRON SILICA COMPANY, AN OHIO CORPORATION; WESCO; WESCO REFRACTORIES; AND WHEELER PROTECTIVE APPAREL, INC., APPELLEES**

---

**On Appeal from the 333rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2006-76611**

---

### OPINION ON EN BANC RECONSIDERATION

We grant Appellants' motion for en banc reconsideration. The opinion and judgment issued on August 30, 2018, is hereby withdrawn, and this en banc opinion and judgment are issued in their stead.

Approximately 20 years ago, there was a significant increase in the number of suits filed in Texas courts alleging injury from silica exposure. In 2005, the

Texas Legislature created a Silica multidistrict litigation pretrial docket that established procedures for individual claims to advance to trial.[1]

Under the provisions of the Silica MDL statute in chapter 90 of the Civil Practice and Remedies Code, each silica claim already pending on August 31, 2005 would remain in the MDL until that particular claimant submitted a medical report complying with certain statutory requirements. If a compliant medical report was submitted and approved by the MDL Court, that claim would then be remanded to the district court for trial. If no medical report was filed, the claim would remain pending in the MDL indefinitely.

Appellants are 106 sandblasters whose already-pending silica claims were transferred into the MDL once it was formed. Their claims remained pending in the MDL for more than 10 years without medical reports being submitted.

As originally enacted, the MDL statute had no provision for involuntary dismissal of silica claims that predated the MDL and were later transferred into it; however, the statute was amended in 2013 to allow for the dismissal without prejudice of pre-2005 claims if claimants failed to file qualifying medical reports by a statutorily specified deadline.

Facing dismissal under the new statutory provision, the sandblasters filed their individual medical reports in 2013. Significantly, these medical reports were

---

[1] *See* TEX. CIV. PRAC. & REM. CODE § 90.001–.012; Act of May 16, 2005, 79th Leg., R. S., ch. 97, § 1, 2005 Tex. Gen. Laws 169.

not prepared contemporaneously with their filing. Two-thirds of them were prepared before May 2005, which means they were written before enactment of the statute that specifies the required content of a medical report for approval by the MDL Court. The remaining one-third were prepared after the statute was enacted—between mid-2005 and 2008.

After the sandblasters filed their medical reports, the Silica MDL defendants filed individual and global objections to the medical reports, contending the reports failed to meet various statutory requirements of Chapter 90. The defendants then moved to dismiss all 106 sandblasters' suits for failure to comply with statutory requirements by the deadline specified in the 2013 amendment. The MDL Court sustained almost all objections and dismissed all the sandblasters' claims without prejudice to refiling. The cases were consolidated, and the sandblasters appealed the dismissal of their claims.

In nine issues, the sandblasters argue that Chapter 90 is unconstitutional. We affirm.

## Background

A Rule 13 pretrial MDL was created in 2004 when the Judicial Panel on Multidistrict Litigation determined the then-pending 71 suits filed by 453 plaintiffs against 158 defendants involved one or more common questions of fact and transfer would be for the convenience of the parties and witnesses and would

6

promote the just and efficient conduct of the cases. *In re Silica Prods. Liab. Litig.*, 166 S.W.3d 3, 5–9 (Tex. M.D.L. Panel Nov. 10, 2004); *see* TEX. R. JUD. ADMIN. 13.

In 2005, the Legislature enacted Chapter 90 of the Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM. CODE § 90.001–.012; Act of May 16, 2005, 79th Leg., R. S., ch. 97, § 1, 2005 Tex. Gen. Laws 169. The new legislation created a statutory MDL for silica-related claims. *Id.* Under the terms of the statute, individual cases were held in the MDL until the plaintiffs submitted medical reports that met all listed statutory requirements. *Id.* § 90.010(d) (providing for cases to remain in MDL until report is filed); *see id.* § 90.004 (specifying required content of medical report for approval). After a qualifying medical report was submitted and approved by the MDL Court, a case would be returned to the district courts for trial. *Id.* § 90.010.

All 106 of the sandblasters who are appealing dismissal of their suits had a claim pending in the Rule 13 MDL in 2005 when Chapter 90 was enacted. Their claims were then transferred to the statutory Silica MDL where they remained for over 10 years without remand for trial.

### *The purpose behind Chapter 90*

The Legislature included official comments when it enacted Chapter 90. *Id.* § 1, cmts. a–n. According to the official comments, individuals who have been

exposed to silica may have "markings on [their] lungs that are possibly consistent with silica exposure, but the individual has no functional or physical impairment from any silica-related disease." *Id.*, cmt. m. The discovery of these markers can trigger a statute of limitations problem for the exposed individuals. *Id.* Individuals' efforts to avoid limitations problems led to a "crush" of suits being filed in the courts on behalf of workers who have shown some signs of exposure but have "no current impairment and may never have impairment." *Id.*, cmts. g, m.

The large number of filings has been described as a "situation [that] has reached critical dimensions and is getting worse." *Id.*, cmt. d. To "prevent[] scarce judicial and litigant resources from being misdirected by the claims of individuals who have been exposed to . . . silica but have no functional or physical impairment from . . . silica-related disease," the Legislature enacted Chapter 90, aimed at "protect[ing] the right of people with impairing . . . silica-related injuries to pursue their claims for compensation in a fair and efficient manner through the Texas court system." *Id.*, cmt. n. Chapter 90 created a bifurcated system to allow those with confirmed impairment to proceed to trial while those without a confirmed impairment would remain in the MDL, without any statute-of-limitations ramifications, until an impairment was confirmed. *Id.*; *see id.* § 90.010(d) (providing that cases remain in MDL without dismissal until qualifying impairment is established).

*Section 90.004*

Section 90.004 requires that certain information be included in a claimant's medical report to qualify for remand to district court for trial and, after the 2013 amendment, to avoid dismissal. The statute requires medical reports based on silica exposure to be prepared by board-certified physicians and to include specific verifications and findings by the report's authoring physician. *See id.* § 90.004. The physician must (1) verify that she or a medical professional employed by and under her direct supervision and control (a) performed a physical exam of the claimant, (b) took a detailed occupational and exposure history, including the claimant's principal employments, exposure to airborne contaminants, and the "nature, duration, and frequency" of exposure, and (c) took a detailed medical and smoking history, including the claimant's "past and present medical problems and their most probable cause"; and (2) set out in her report the claimant's "occupational, exposure, medical, and smoking history." *Id.* § 90.004(a)(1)–(2), (e).

The physician must also verify the claimant has "one or more" of the following: (1) "a quality 1 or 2 chest x-ray that has been read by a certified B-reader according to the ILO system of classification[2] as showing . . . bilateral

---

[2] Chapter 90 defines "ILO system of classification" as "the radiological rating system of the International Labor Office in 'Guidelines for the Use of ILO

predominantly nodular opacities (p, q, or r) occurring primarily in the upper lung fields" with a specified "profusion grading"; (2) "pathological demonstration of classic silicotic nodules exceeding one centimeter in diameter as published in 'Diseases Associated with Exposure to Silica and Nonfibrous Silicate Minerals,' 112 Archives of Pathology and Laboratory Medicine 7 (July 1988)";[3] (3) "progressive massive fibrosis radiologically established by large opacities greater than one centimeter in diameter"; or (4) "acute silicosis." *Id.* § 90.004(a)(3).

In addition to these verifications, detailed statements, and medical conclusions, the physician's report must be "accompanied by copies of all ILO classifications, pulmonary function tests, including printouts of all data, flow volume loops, and other information demonstrating compliance with the equipment, quality, interpretation, and reporting standards set out in this chapter, lung volume tests, diagnostic imaging of the chest, pathology reports, or other

---

International Clasification of Radiographs of Pneumoconioses' (2000), as amended." TEX. CIV. PRAC. & REM. CODE § 90.001(11).

[3] In September 2005, the MDL Court provided an interpretation of the statute to all parties, which is in the clerk's record, memorializing that the parties had agreed the "original statutory language 'nodules *exceeding* one centimeter'" should read "nodules *less than* 1 cm in diameter." There is no indication in the record that any party objected to this statement or sought an alternative statutory interpretation from the MDL Court.

testing reviewed by the physician in reaching the physician's conclusions."[4] *Id.* § 90.004(a)(4).

For silicosis claims, the statute requires physician verification of a claimant's impairment. *Id.* § 90.004(b). The physician must verify that (1) there has been a sufficient latency period for the type of silicosis alleged; (2) the claimant has "at least Class 2 or higher impairment due to silicosis, according to the American Medical Association Guides to the Evaluation of Permanent Impairment and reported in 20 C.F.R. Part 404, Subpart P, Appendix 1, Part (A), Sections 3.00(E) and (F) (2003)"; and (3) the physician has concluded the medical findings and impairment "were not more probably the result of causes other than silica exposure" as possibly signified by the claimant's occupational, exposure, medical, and smoking history. *Id.* For silica-related lung cancer and another silica-related disease, the statute lists additional requirements. § 90.004(c)–(d).

Thus, to qualify under Section 90.004, a claimant's medical report must contain certain, specific findings, diagnoses, and verifications by the board-certified physician who authors the report. The content of the report must be based on the claimant's physical examination and pulmonary function testing, and it must

---

[4]     The same MDL Court statutory-interpretation filing directs that a standard pulmonary-function report is not required to include pulmonary-function-testing compliance data or detailed printouts of how the tests were performed; however, "any PFT [pulmonary function testing] data reviewed by the physician to reach his conclusion must accompany the report."

take into account the American Medical Association (AMA) Guides, federal regulations concerning appropriate testing to establish a respiratory impairment,[5] and a medical article published in the Archives of Pathology and Laboratory Medicine.

### Section 90.010

Section 90.010 directs when a case may transfer from the statutory MDL to the trial court. *Id.* § 90.010. It specifically states it applies to Rule 13 MDL cases that were pending when Chapter 90 was enacted. *Id.* §90.010(a). Thus, its provisions apply to all 106 sandblasters' claims.

Section 90.010 requires the statutory Silica MDL Court to retain jurisdiction over pending suits and not to remand them for trial until the individual claimants file medical reports complying with Section 90.004 or, alternatively, with a limited "safety valve" provision found in Section 90.010(f). *Id.* § 90.010(d); *see id.* §90.010(f)–(j). Until a qualifying report is filed and approved, the cases remain inactive. *See id.* § 90.010.

### Silica MDL judge's Section 90.010(k) report

Section 90.010(k) requires the Silica MDL Court to present a report to state government officials five years after statututory enactment that details the total number of cases on the docket as well as the number of those cases that do not

---

[5] 20 C.F.R. Part 404, Subpart P, Appendix 1, Part (A), Sections 3.00(E) and (F) (2003).

meet the criteria for a Section 90.004 compliant medical report; states the Silica MDL Court's "evaluation of the effectiveness of the medical criteria established by Section . . . 90.004"; recommends "how medical criteria should be applied"; and includes any other administrative information the statutory Silica MDL Court deems appropriate. *Id.* § 90.010(k).

The Silica MDL Court submitted the required report in September 2010.[6] The judge declined to comment on policy issues related to the statute:

> [A]s to whether the criteria themselves or the minimum levels of impairment are appropriate, I am not in a position to ethically opine. This is more appropriately a matter for the law makers . . . . It all depends on what the law makers of Texas believe the definition of "impairment" should be to allow a claimant to proceed in court in these cases.

However, the MDL Court did provide statistical information regarding the progression of the docket. As of August 1, 2010, there were 667 cases in the silica MDL, representing 5,839 "exposed persons." Only 54 of the individual claimants had filed medical reports under Section 90.004. Only half of those had been submitted to the MDL Court for evaluation:

---

[6] http://www.justex.net/JustexDocuments/24//Section%2090.010%28k%29%20 Report.pdf

| | | |
|---|---|---|
| Claimants who had filed a medical report | 54 | |
| – Number who had not yet been evaluated by MDL Court because report was withdrawn from consideration or never submitted | 28 | |
| – Number who had filed and submitted report for consideration | 26 | |
| • *Number who had been approved* | | *22* |
| • *Number who had not yet been determined* | | *1* |
| • *Number who were not approved because defendants' objection(s) were sustained* | | *3* |

None of the remaining 5,817 claimants had filed medical reports in the five years the MDL had existed.

### *Section 90.010(d-1) dismissal procedure*

In 2013, the Legislature amended Section 90.010 to establish a procedure for dismissal of silica cases filed before the 2005 legislation was enacted but for which no medical report were submitted by a specified deadline. *Id.* § 90.010(d-1). The MDL Court could begin dismissing pre-2005 cases for failure to file compliant medical reports in September 2014 and was required to complete the dismissals of such claims by August 2015. *Id.*

The Legislature further amended the statute to provide that dismissals under Subsection (d-1) would be without prejudice to the filing of a subsequent action

and that any refiled action would be treated as through it had never been dismissed. *Id.* §§90.010(*l*)–(n).

### *An effort to enjoin the dismissal of claims under Subsection (d-1)*

Before the September 2014 date on which dismissal of pre-2005 cases could begin, all 106 sandblasters filed a joint request for injunctive relief, seeking to enjoin enforcement of 90.010(d-1). They argued the medical-report requirement was "oppressive and unreasonable" and nearly impossible to satisfy. They presented various constitutional challenges as a facial challenge to the statute, meaning that the statute, by its terms, always operates unconstitutionally. *See New York State Club Ass'n v. City of New York*, 487 U.S. 1, 11 (1988). The MDL Court denied the sandblasters' motion for injunctive relief for jurisdictional deficiencies.

A panel of this Court affirmed the MDL Court's order denying injunctive relief, holding that a motion seeking to enjoin a court from enforcing a statute is not a proper vehicle to challenge a statute's constitutionality. *In re Tex. State Silica Prods. Liab. Litig.*, No. 01-15-00251-CV, 2016 WL 757873, *8 (Tex. App.—Houston [1st Dist.] Feb. 25, 2016, no pet.) (stating that, when court determines statute is unconstitutional, it "does not enjoin itself from enforcing a defective law; it merely declares the law unconstitutional."). After the sandblasters' interlocutory appeal was denied, the case proceeded in the MDL Court.

The sandblasters began filing their Section 90.004 medical reports as required by the 2013 amendment to Section 90.010(d-1) to avoid dismissal. Defendants filed general objections and specific objections to individual medical reports or subsets of reports. The sandblasters responded. Defendants then filed a "motion to dismiss any plaintiff whose medical records are deemed not compliant with Chapter 90," and all parties filed related responses and briefing. The sandblasters argued both that their medical reports complied with the statutory requirements and that the statute was unconstitutionally vague. The MDL Court held a hearing on the pending motions.

The MDL Court issued its rulings in separate orders for each sandblaster. Each order overruled one general objection (as to the timeliness of the medical report filings) and sustained all other general and individual objections to that sandblaster's medical report. The MDL Court dismissed each individual sandblaster's claim. By agreement, the cases were consolidated for appeal.

The sandblasters filed a joint appellate brief, contending Chapter 90 is unconstitutionally vague in several respects and is an unconstitutional retroactive law.

16

## Constitutional Vagueness Challenges

The sandblasters raise five challenges to Chapter 90 premised on a constitutional vagueness argument. We consider each argument separately, but first, we review the standard for a constitutional vagueness challenge to a civil statute.

### A.    Vagueness standard for civil statutes

Under the United States Constitution, "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Vague laws "may trap the innocent by not providing fair warning" and can "impermissibly delegate[ ] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108–09. To avoid these dangers, the Due Process Clause requires that laws be reasonably clear. As the United States Supreme Court explained, due process

> ensures that state power will be exercised only on behalf of policies reflecting an authoritative choice among competing social values, reduces the danger of caprice and discrimination in the administration of the laws, enables individuals to conform their conduct to the requirements of law, and permits meaningful judicial review.

*Roberts v. United States Jaycees*, 468 U.S. 609, 629 (1984).

Both the United States Supreme Court and the Supreme Court of Texas have applied the principle that statutory language may not be so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen'l Constr. Co.*, 269 U.S. 385, 391 (1926); *Tex. Antiquities Comm. v. Dallas Cty. Comm'y Coll. Dist.*, 554 S.W.2d 924, 928 (Tex. 1977) (plurality opinion) (quoting same).

"Although the vagueness standard applies most frequently to penal statutes, a civil statute may also be so vague that it violates due process." *Bradley v. State ex rel. White*, 990 S.W.2d 245, 252 (Tex. 1999) (Abbott, J., concurring); *see A.B. Small Co. v. Am. Sugar Ref. Co.*, 267 U.S. 233, 239–40 (1925) (explaining that rationale stated in previous vagueness cases is not limited to criminal cases because "[i]t was not the criminal penalty that was held invalid, but the exaction of obedience to a rule or standard which was so vague and indefinite as really to be no rule or standard at all"); *Tex. Antiquities Comm.*, 554 S.W.2d at 927–28 (striking down civil statute as unconstitutionally vague). "The degree of clarity that the vagueness standard . . . requires 'varies according to the nature of the statute, and the need for fair notice or protection from unequal enforcement.'" *Bradley*, 990 S.W.2d at 252 (Abbott, J., concurring); *see Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (in directing that vagueness standard not be mechanically applied, stating, "The degree of vagueness

18

that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment.").

There is "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* Statutes that "do not impose criminal penalties and those that do not threaten to inhibit the exercise of constitutionally protected rights are subject to a less strict vagueness test." *Raitano v. Tex. Dep't of Pub. Safety*, 860 S.W.2d 549, 551 (Tex. App.—Houston [1st Dist.] 1993, writ denied). A civil statute violates due process only if it requires compliance in terms "so vague and indefinite as really to be no rule or standard at all." *A.B. Small Co.*, 267 U.S. at 239; *see State ex rel. N.P.N.*, No. 12-06-00283-CV, 2007 WL 1139907, at *1 (Tex. App.—Tyler Apr. 18, 2007, no pet.) (mem. op.) (quoting same).

When considering an attack on a statute's constitutionality, we begin with a presumption the statute is valid and the Legislature did not act arbitrarily or unreasonably in enacting it. *Robinson v. Hill*, 507 S.W.2d 521, 524 (Tex. 1974). We must uphold a statute if a reasonable construction can be determined that will render it constitutional. *Rowan Drilling Co. v. Sheppard*, 87 S.W.2d 706, 707 (Tex. 1935) (orig. proceeding). The burden rests on the individual challenging a statute to prove its unconstitutionality. *Robinson*, 507 S.W.2d at 524.

**B.    Incorporation of 20 C.F.R. Part 404 into Chapter 90 does not render the statute unconstitutionally vague**

There are 106 sandblasters appealing the dismissal of their suit. Of those, five do not have medical records in the appellate record. An additional 58 sandblasters do not have medical records that reflect an impairment rating of Class 2 or higher. Thus, more than half of the sandblasters cannot establish on this record that they submitted medical reports containing the statutorily required impairment finding. *See* TEX. CIV. PRAC. & REM. CODE § 90.010(d-1) (requiring dismissal of claims without compliant medical report submitted); § 90.004(b)(2) (requiring medical reports for silicosis claimants to contain board-certified physician's verification that "the exposed person has at least Class 2 or higher impairment due to silicosis").

Defendants asserted objections against more than half of the 106 sandblasters' medical reports for failing to include the requisite impairment finding and moved for dismissal of those claims. The objections were sustained.

The sandblasters do not argue the MDL Court erred in concluding some of their medical reports did not have the requisite impairment finding. Instead, they argue dismissal for this reason is improper because Section 90.004 is unconstitutionally vague because the subsection imposing a requirement of a Class 2 impairment finding refers to the AMA Guides and then references the Code of Federal Regulations even though the AMA Guides "are *not* reported in the

20

referenced section of the C.F.R." The challenged provision requires a silicosis claimant to submit a medical report verifying that

> the exposed person has at least Class 2 or higher impairment due to silicosis, according to the American Medical Association Guides to the Evaluation of Permanent Impairment and reported in 20 C.F.R. Part 404, Subpart P, Appendix 1, Part (A), Sections 3.00(E) and (F) (2003).

*Id.* § 9.004(b)(2). According to the sandblasters, creating an understanding in a reader that a cited material can be found at a location where it cannot be found creates a constitutional infirmity in a statute. We cannot agree with their argument for two reasons.

First, we do not read the above provision to suggest that the AMA Guides are located in the C.F.R. but, instead, that the impairment determination is to be made in accordance with what is reported in the C.F.R. at the specified location. The referenced portion of the C.F.R. discusses testing used to evaluate respiratory disorders in the context of social security disability determinations. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Part (A), Sections 3.00(E) and (F) (2003). There, Subsection 3.00(E) explains "[w]hat is spirometry and what are our requirements for an acceptable test and report" to demonstrate a respiratory disorder, and Subsection 3.00(F) explains "[w]hat is a DLCO [diffusing capacity of the lungs for carbon monoxide] test, and what are our requirements for an acceptable test and report" in establishing a respiratory disorder. *Id.*; *see also id.* Section 3.00(C)(9)

21

(defining DLCO). The statute does not purport to provide a citation to where AMA Guides can be located and read. Rather, it refers to recognized testing standards that apply when making a respiratory-disorder impairment determination.

Second, even if the reference to the C.F.R. was meant to be a citation for a reader to locate the AMA Guides, we fail to see why an incorrect citation would render the statute unconstitutionally vague. The sandblasters have not argued they are unable to locate copies of AMA Guides from any source and must rely on this single citation to find controlling materials. They argue no more than that the provided citation does not lead to a recitation of applicable Guides. An incorrect citation in this context—which would be analogous to a broken link to an otherwise accessible webpage—does not cause Chapter 90 to be unconstitutionally vague because it does not leave a person of common intelligence guessing at the statute's meaning or reduce it to no standard or rule at all. *See A.B. Small Co.*, 267 U.S. at 239; *Tex. Antiquities Comm.*, 554 S.W.2d at 928.

We hold that this citation argument does not support a conclusion that Section 90.004(b)(2) is unconstitutionally vague. We affirm the dismissal of the 63 sandblasters who did not submit medical reports with the requisite impairment finding. These sandblasters are listed below:

22

Adan Adame
Roberto Arispe
Harvey Arnold
Hermon Arnold
Luciano Barrientez
Troy Britt
Raymond Butterfield
Richard Capson
Mercedes Castillo
Rex Cicero
Palfrey Collins
Glenn Courmier
Eddie Cross
Carol Dabney
Jose De La Paz
Jose Duenes
Benjamin Fields
Frank Franco
Jesus Garcia
Alonzo Garza
Hermilio Garza
Oscar Garza
Paul Gawlik
Manuel Gonzales
Bacilio Guzman
Chester Harington
Norris Hawley
Rigoberto Hernandez
Kenneth Houff
Elmer Jamison
Curtis Jones
Joe Koenig

Elias Leal
Roberto Lemos
Celso Lopez
George McFarland
Robert Mechell
Jose Meza
Clyde Miller
Keith Moore
Esteban Nieto
Marcos Ortiz
Jimmy Patterson
Manuel Paz
Juan Perez
Ray Redmon
Billy Richardson
Jose Rodgers
Jose Rojas
George Saenz
Hector Salazar
Guadalupe Serna
Jesus Soliz
Howard Spears
Carroll Stakrs
Curtis Thomas
Martin Torres
Enrique Villarreal
Robert Weitzel (deceased)
Clifton Weitzel
Joseph Wheeler
Jay Whitlock
Herbert Whitmire

We will consider the remaining constitutional challenges in light of the MDL Court's ruling on objections to the remaining 43 claimants.

**C.** **Requirement that medical report contain verification by report's physician-author regarding the collection of medical and occupational history is not unconstitutionally vague**

Defendants objected to the medical history, occupational history, or both histories for multiple sandblasters. We affirm the dismissal of 13 sandblasters because, first, their medical reports did not contain a verification by the physician-author that the physician (or a medical professional employed by and under the direct supervision and control of the physician) took a detailed medical and smoking history that includes a thorough review of the exposed person's past and present medical problems and their most probable cause and, second, the medical/occupational history requirement is not unconstitutionally vague. *See* TEX. CIV. PRAC. & REM. CODE § 90.004(a)(1).

**1.** **Meaning of "detailed medical history" and "detailed occupational exposure history"**

The sandblasters argue Section 90.004(a)(1)'s requirement that a board-certified physician verify she (or a medical professional employed by and under her direct supervision) "took a detailed occupational and exposure history from the exposed person" and "took a detailed medical and smoking history that includes a thorough review of the exposed person's past and present medical problems and their most probable cause" is unconstitutionally vague. *See id.* § 90.004(a)(1)(B–C). They attribute the vagueness to the lack of a statutory definition for the terms "detailed occupational and exposure history" and "detailed medical . . . history."

24

Chapter 90 contains a definition section in which 29 terms are defined, but "detailed occupational and exposure history" and "detailed medical . . . history" are not among them. *Cf. id.* § 90.001 (defining certain terms used in Chapter 90). Nonetheless, Section 90.004 provides guidance on the meaning of these phrases. Section 90.004(e) states that the "detailed occupational and exposure history required by Subsection (a)(1)(B) must describe . . . the exposed person's principal employments and state whether the exposed person was exposed to airborne contaminants, including silica and other dusts that can cause pulmonary impairment; and . . . the nature, duration, and frequency of the exposed person's exposure to airborne contaminants, including silica and other dusts that can cause pulmonary impairment." *Id.* § 90.004(e). Section 90.004(A)(1)(C) explains that a "detailed medical and smoking history" should include "a thorough review of the exposed person's past and present medical problems and their most probable cause." *Id.* § 90.004(a)(1)(C).

We conclude these provisions amply describe what is meant by the statutory phrases "detailed occupational and exposure history" and "detailed medical . . . history" so as not to be so vague that persons "of common intelligence must necessarily guess at its meaning." *See Connally*, 269 U.S. at 391; *Tex. Antiquities Comm.*, 554 S.W.2d at 928.

## 2. Verification regarding medical history

Aside from whether these terms are sufficiently understandable to survive a vagueness challenge, there appears to be an incongruence between the objections asserted against the medical reports and the sandblasters' argument with regard to their medical histories. For several sandblasters, Defendants asserted an "objection to insufficient medical history." A closer reading of the objection reveals that the argument is not that the medical histories lack detail, which is the argument the sandblasters appear to respond to with the above vagueness challenge. Instead, the objection is that Section 90.004(a)(1)(C) requires the submitted medical report to include a physician *verification* that "the physician or a medical professional employed by and under the direct supervision and control of the physician . . . took a detailed medical . . . history," yet the objected-to sandblasters' medical reports have no such verification. There is a medical history, but there is no *verification* by the physician-author that she (or a qualifying medical professional) took the medical history. Defendants argue the sandblasters without an appropriate verification failed to comply with statutory requirements. This is the objection asserted by Defendants and sustained by the MDL Court.

Our review of the medical records of the remaining 43 claimants reveals 13 whose medical reports did not include physician verifications.[7] The MDL Court did not err in sustaining the medical-history objection to these 13 sandblasters, and we affirm their dismissal:

| | |
|---|---|
| Thomas Benitez | David Hollingsworth |
| Melvin Briones | Juan Morales |
| Francisco Dabdub | Daniel Navejar |
| Jessie Duncan | Carl Prentice |
| Jose Fajardo | Jose Rios |
| Michael Gary | Abelardo Zambrano |
| Gerald Henry | |

---

[7] Why these 13 sandblasters' medical reports lacked verifications might be understood, at least in part, by considering the history of this type of litigation and taking into account when the medical reports were prepared compared to when the MDL statute was enacted. As noted in the official comments to Chapter 90, there was a great deal of activity in silica-exposure litigation in the early 2000s, when thousands of claims were filed in state district courts because of concerns about limitations issues. Those claimants submitted to x-rays and other testing for evidence of silica exposure and to physician exams by physicians who then prepared contemporaneous medical reports discussing illness diagnoses and impairment findings. These medical reports for these 13 sandblasters were prepared in 2005, within a few months of Chapter 90 being enacted. Their medical reports were not supplemented, as some were for other claimants with older reports. Thus, these 13 sandblasters were relying on medical reports prepared at a time when the physician-author may not have known Chapter 90's requirements for a qualifying medical report.

As the sandblasters have noted, there were cost considerations when evaluating whether to amend older medical reports before submitting them to the MDL Court, but the MDL procedures certainly allowed amended medical reports to be filed. The record reflects that, on at least one occasion, a claimant who is not part of this appeal filed amended medical reports and then was able to move for remand and a trial setting. Still other claimants filed single-page supplements in which physicians added the verifications required by Section 90.004. These 13 sandblasters did not amend or supplement their medical reports, but there was nothing in the statute preventing them from doing so.

27

This leaves 30 sandblasters.

**D.  Failure to designate the AMA Guides edition that would control evaluation of medical reports does not render statute unconstitutionally vague**

Defendants objected that some sandblasters' medical reports did not confirm exercise testing as part of their medical evaluations. The MDL Court sustained the objections. The sandblasters argue Chapter 90 is unconstitutionally vague because the various editions of the AMA Guides are inconsistent regarding the requirement of exercise testing and the statute does not specify which edition is to be followed, creating uncertainty as to whether the statute requires exercise testing. They argue the statute "lacks definiteness or certainty" and violates due process guarantees.

The record does not support the sandblasters' uncertainty argument. In March 2006, the MDL Court issued a supplement to its recommended checklist for medical reports and documentation.[8] The supplement states that the fifth edition of the AMA Guides to the Evaluation of Permanent Impairment "shall be used to determine impairment." It further states that, "[i]f the AMA publishes a new edition of the AMA Guides, the new edition shall apply to medical reports based on examinations or testing performed on or after the date of publication of the new edition." And, to further clarify, it adds, "If a new edition is published, medical reports that have already been approved under the current [fifth] edition shall not

---

[8]  The supplement is in the record and was attached to the sandblasters' response to the objections to their medical reports.

be subject to the new edition." None of the parties contend the trial court erred in determining that the statute requires the application of the guidelines in effect at the time of testing.

To the extent the sandblasters chose to rely on their pre-written medical reports, the MDL Court indicated in 2006 their reports would be evaluated under the fifth edition's requirements. If the sandblasters amended their reports, their new reports would be evaluated under the version of the AMA Guides in existence when the underlying examinations and testing were performed. If the sandblasters preferred the impairment criteria in the sixth edition, additional testing and an amended report would have brought the reports within its requirements.

Ten of the remaining sandblasters submitted medical reports that pre-dated the 2006 MDL Court supplemental filing, in which the MDL Court stated that already-performed medical testing would be analyzed under the fifth edition. None of them amended their reports over the next decade. In that context, there was no uncertainty whether the fifth edition applied to their reports: it clearly did. Because the following sandblasters did not submit medical reports with the required data on exercise testing, the dismissal was not error with regard to these 10 sandblasters:

| | |
|---|---|
| Noe De La Cruz | Daniel Ochoa |
| Ronnie L. Johnson | Humberto Chapa |
| Jose Longoria | Rudy Encinas |
| Victor Perez | Dell Hodge |
| Roberto Paz | Roger Spencer |

29

This leaves 20 sandblasters.

**E.      Requirement of certain x-ray findings indicating lung abnormalities is not unconstitutional**

The sandblasters' next constitutional argument is that Section 90.004(a)(3)(A) arbitrarily requires medical reports to contain a finding from the x-rays that the claimant's pulmonary scarring is "predominately nodular" and "primarily in the upper lung fields," even though silicosis can be a lower-lobe disease. By requiring these specific findings, they argue, Chapter 90 wrongly excludes claimants who have atypical silicosis or pneumoconiosis, which can present primarily in the lower lobes of the lungs. They contend these statutory limitations are unreasonable, arbitrary, and capricious.

Subsection (f) of Section 90.010 is referred to as a "safety value" provision. It establishes a path to medical-report approval for claimants whose medical profiles do not match the Section 90.004 criteria. Under Subsection (f), a claimant who cannot meet Section 90.004(a)(3)'s requirements but does comply with Section 90.004(a)(1), (2), and (4) has another option: a physician can verify there is a physician-patient relationship between the physician-author of the report and the claimant, pulmonary function testing was performed, and the physician has concluded, to a reasonable degree of medical probability, that the claimant has "radiographic, pathologic, or computed tomography evidence establishing bilateral pleural disease or bilateral parenchymal disease caused by exposure to . . . silica;

30

and . . . has . . . silica-related physical impairment comparable to the impairment" the claimant would have had if he had met the criteria in Section 90.004. *Id.* § 90.010(f)(1)(B). Under Subsection (f), neither the "predominantly nodular" requirement nor the "primarily in the upper lung fields" requirement applies. *Compare id.* § 90.004(a)(3), *with* § 90.010(f)(1)(B)(iii-iv). Subsection (f) was available to sandblasters who did not present with typical findings. None of the remaining 20 sandblasters moved for consideration under Subsection (f).

Sections 90.004 and 90.010 must be analyzed in light of the statute as a whole. *See Taylor v. Firemen's & Policemen's Civil Serv. Comm'n of City of Lubbock*, 616 S.W.2d 187, 190 (Tex. 1981). Taking into account Subsection (f), which presents an alternative means to establish an injury and impairment, the specificity of Section 90.004 does not create an arbitrary approval process that denies the sandblasters due process.

We overrule this constitutional challenge and conclude the MDL Court did not err in dismissing the following 20 sandblasters for failure to submit medical reports with the requisite findings:

| | |
|---|---|
| Homer Batchelor | Antonio Lopez |
| Delbert Blundell | Aaron Luke |
| Guadalupe Calvo | Ernest Mechell |
| Ignacio Cavazos | Tomas Morin |
| Hector Chapa | Adalberto Muniz |
| Steve Davis | Oscar Perez |
| Jose Esquivel | Rene Ramirez |
| Pablo Garcia | William Terral |
| Homero Garza | Teodoro Tovar |
| Jose Hernandez | Jose Uresti |

We have concluded the MDL Court did not err in sustaining certain objections to various subsets of sandblasters and have overruled the sandblasters' constitutional challenges to the statutory provisions on which those particular objections were based. We turn next to the sandblasters' global constitutional challenges to Sections 90.004 and 90.010 that are not tied to any specific objections.

**Global Constitutional Challenges Not Tied to Any Specific Objections**

Claimants assert two global constitutional challenges to Sections 90.004 and 90.010.

**A.  MDL Court's statutory authority to evaluate the sufficiency of medical reports does not render Chapter 90 unconstitutionally vague**

The sandblasters challenge the statutory framework of Chapter 90 granting the MDL Court authority to determine whether a medical report complies with Section 90.004's requirements. They argue the "framework places the Court in the

precarious position of rendering medical opinions and providing medical interpretation even though the Court has no specialized training in medicine or impairment evaluations." They further argue "the statute allows untrained courts and lawyers to interpret highly technical medical articles" without fully understanding their content, which denies the sandblasters due process.

This argument is reminiscent of initial challenges to the expert-reliability framework established in *Daubert* and *Robinson*. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995) (rejecting arguments that (1) "judges are not competent to assess the scientific reliability" of expert evidence and (2) judges should not be cast in "role of amateur scientist"). Since *Robinson*, a body of law has developed that confirms trial judges' role in assessing the reliability of expert opinions and the data underlying their opinions, including evidence concerning medical diagnoses and medical causation. *See, e.g.*, *Transcont'l Ins. Co. v. Crump*, 330 S.W.3d 211, 215–20 (Tex. 2010) (analyzing reliability of treating physician's diagnostic methodology and evaluating whether analytical gap exists between plaintiff's medical data and physician's causation opinion).

The sandblasters assert that judges and lawyers are "untrained" in medicine and do not have the necessary "specialized training" required to "interpret highly technical medical articles" or access "impairment evaluations." But, Texas courts

33

have consistently rejected arguments built on a supposition that trial courts are incapable of assessing scientific issues.[9] *See Robinson*, 923 S.W.2d at 557–58 (rejecting contention that judges must be "trained in science to evaluate the reliability of a theory or technique"; accepting that judges are "capable of understanding and evaluating scientific reliability"); *see also Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 713, 730 (Tex. 1997) (stating that courts should independently evaluate scientific data underlying expert's opinion as part of determining whether expert's opinion is reliable).

In *Havner*, the Supreme Court of Texas analyzed the scientific data and medical literature underlying an expert's opinion that there is a causal link between

---

[9]  There are a number of reasons it is appropriate to have judges determine complex scientific issues before cases proceed to trial within a crowded docket like an MDL. The trial process uses court and litigant resources on particular claimants, leaving other claimants waiting in the queue. Those waiting might be more impaired than those who reach the trial phase first if there is not a procedure in place to prioritize the more seriously ill claimants. The Legislature created a separate MDL for silica-based claims and supplemented the judge's salary in recognition that the judge would need to allocate sufficient time to manage the docket and analyze complex procedural and scientific issues and evidence. The judge has resources available for evaluating evidence that would not be available to a jury if the decisional process for determining the adequacy of a gatekeeping report was delegated to a jury. The judge has the opportunity to read and study any underlying articles and scientific studies supporting medical conclusions, the ability to conduct or direct additional research on an issue or to require additional hearings or evidence, and, finally, the procedural flexibility to ask questions of designated experts and to hire, appoint, and confer with experts beyond those designated by the parties. *See* Harvey Brown, *Procedural Issues Under Daubert*, 36 Hous. L. Rev. 1133, 1176–77 (1999) (stating that "a judge may not be smarter than a jury, but the judge has resources that are unavailable to the jury" to equip the judge to analyze complex expert issues).

ingestion of a drug during pregnancy and a subsequent birth defect, and the Court held there was no scientifically reliable evidence to support the causation opinion, meaning there was legally insufficient evidence to support the jury's verdict finding the pharmaceutical company liable for the birth defects. *See Havner*, 953 S.W.2d at 730. As *Havner* demonstrates, while the task can be daunting at times, judges have the duty as gatekeepers to evaluate scientific evidence, medical expert opinions, and the data underlying them.

Section 90.004 requires a medical report to contain various physician verifications, set forth relevant histories, contain a diagnosis and impairment finding, and attach relevant medical records relied on by the physician in reaching her conclusions. *See* TEX. CIV. PRAC. & REM. CODE § 90.004. We fail to see how a statute requiring a court to evaluate the content of a medical report for these items is so vague that it is "no rule or standard at all." *See A.B. Small Co.*, 267 U.S. at 239 (setting forth civil vagueness standard).

Nor do we see how the specific scientific area of study addressed in the statute—silica-related illnesses and impairment—contributes to vagueness.

The Texas Supreme Court has noted the similarity between the MDL Court's role under Chapter 90.004 and trial courts' role, generally, in evaluating the reliability of medical experts' methodologies and underlying data. *See In re GlobalSanteFe Corp.*, 275 S.W.3d 477, 487 (Tex. 2008). The issue in that case

35

was whether the Jones Act preempts various Chapter 90 features. *See id.* In detailing the Chapter 90 features, the Court stated that "Section 90.004 tracks widely if not universally recognized criteria for reliably diagnosing the existence of silica-related illnesses." *Id.* The Court offered four examples of Section 90.004 requirements aimed at ensuring reliability: (1) Section 90.004(a)(1)'s requirement that a "board-certified physician conduct a detailed occupational and exposure history is directed at assuring—early in the litigation so as to conserve judicial and litigant resources—that the claim of silica-related injury is supported by medically reliable expert review"; (2) Section 90.004(a)(3)'s requirement that the expert observe specific findings that are the "standardized method of medical science to identify chronic or classic silicosis and distinguishing it from asbestosis"; (3) Section 90.004(b)(1)'s requirement that the physician verify a sufficient latency period "to assure that the claimant is in fact suffering from a silica-related disease under established medical science"; and (4) Section 90.004(a)(3)(A)'s requirement that a qualified B-reader make certain findings to further "assure that the reader has found at least some abnormality in the x-ray." *Id.*

Section 90.004's criteria are "directed at assuring reliable expert confirmation of the existence of one of the medically recognized forms of silica-related illness," and an expert's "failure to establish these criteria is grounds for rejecting expert testimony under *Daubert*," even if the criteria were not

incorporated into Chapter 90. *Id.* at 487–88. Section 90.004's requirements "represent the Legislature's attempt to require a medically valid demonstration of silica-related disease as opposed to mere exposure to silica or some other substance or mere concern that a disease may develop in the future." *Id.* at 488.

The Court also noted "it is vitally important for a physician to take a thorough occupational/exposure history and medical history" to "rule out the multitude of other causes of the radiographic findings." *Id.*

The Court's statements in *In re GlobalSanteFe* are consistent with our conclusion that authorizing a court to evaluate whether a medical report complies with Section 90.004's requirements does not violate the sandblasters' right to due process. We overrule the sandblasters' constitutional challenge premised on the argument that trial courts are incapable of assessing complex medical materials and expert medical opinions related to the diagnosis of silicosis and related impairment.

**B.    The addition of Section 90.010(d-1) through a 2013 amendment does not make the statute an unconstitutional retroactive law**

The sandblasters contend Section 90.010(d-1), which was added to Chapter 90 in 2013 through a statutory amendment, is an unconstitutionally retroactive law.

Subsection (d-1) created a procedure, which had not existed under the earlier version of Chapter 90, for the dismissal of pre-2005 claims that had been pending in the MDL for nearly a decade without medical reports being submitted. *See* TEX.

CIV. PRAC. & REM. CODE § 90.010(d-1). Subsection (*l*) stated dismissal under Subsection (d-1) would be without prejudice to refiling. *Id.* § 90.010(*l*).

The sandblasters acknowledge dismissal under Subsection (d-1) for failing to file a conforming medical report is without prejudice to refiling; however, they assert dismissal is still prejudicial because they will not be able to recapture some of the defendants that have already answered and appeared and because dismissal will cause them to lose their financial investment in their cases, including already incurred costs for filing fees, court records, deposition transcripts, and experts. The sandblasters argue the costs associated with these expenses and attorney work would be lost if their cases were dismissed.

### 1. Applicable law

The Texas Constitution prohibits "retroactive law[s]." TEX. CONST. art. I, § 16; *see Houston Indep. Sch. Dist. v. Houston Chronicle Pub. Co.*, 798 S.W.2d 580, 585 (Tex. App.—Houston [1st Dist.] 1990, writ denied) ("Texas law militates strongly against the retroactive application of laws.").

An unconstitutional retroactive law is one that "takes away or impairs vested rights acquired under existing law." *McCain v. Yost*, 284 S.W.2d 898, 900 (Tex. 1955); *see Retroactive law*, BLACK'S LAW DICTIONARY (10th ed. 2014) (defining as law that "divests vested rights"). A "vested right" is an immediate right or entitlement; expectations and contingencies do not qualify. *See Kissick v. Garland*

38

*Indep. Sch. Dist.*, 330 S.W.2d 708, 712 (Tex. Civ. App.—Dallas 1960, writ ref'd n.r.e.). "When the authority granting the right has the power and discretion to take that right away, it cannot be said to be a vested right." *Ex parte Abell*, 613 S.W.2d 255, 262 (Tex. 1981); *see McCain*, 284 S.W.2d at 900.

A statute can apply retroactively and yet not be a "retroactive law" if the right it affects did not accrue before the statute became effective. *See Houston Indep. Sch. Dist.*, 798 S.W.2d at 585.

### 2. The sandblasters have no vested right to the application of the pre-amended version of Chapter 90

The sandblasters' suits all pre-dated the enactment of Chapter 90. When they filed their claims, they were governed by the general rules of procedure and evidence and faced the possibility that their claims would be dismissed for want of prosecution if they lingered without advancement. *See* TEX. R. CIV. P. 165a(2) (providing that cases not disposed of within applicable time standards may be placed on dismissal docket).

It was after the sandblasters initiated their suits that the Legislature enacted Chapter 90's procedural scheme to permit silica-related claims to remain within the court's jurisdiction, protected from dismissal. *See* TEX. CIV. PRAC. & REM. CODE § 90.010(a)(1), (b), (d). The sandblasters benefitted from this law because their claims remained on the MDL docket, in a holding pattern, for more than a decade without the risk of dismissal for lack of prosecution. And, the sandblasters received

39

a second benefit from the 2005 enactment of Chapter 90: they did not risk going to trial when they had lung markings "possibly consistent with silica exposure" but "no functional or physical impairment." They could wait until they had a medically verified impairment to go to trial, at which point they would have the potential for a larger damages award.

After the MDL Court submitted its Subsection (k) report in 2010, showing that only 54 of over 5,000 claimants had filed medical reports, the Legislature amended the statute to add Subsection (d-1) and require claimants to take the next step in their case progression or face dismissal. Those who filed qualifying medical reports would be remanded to district court for trial; those who did not would be dismissed without prejudice to refiling. *Id.* § 90.010(d-1), (*l*). Staying indefinitely in the holding pattern would no longer be an option.

The statute specifically provides that a claim dismissed under Subsection (d-1) and later refiled "is treated for purposes of determining the applicable law as if that claimant's action had never been dismissed but, instead, had remained pending until the claimant served a report that complied with . . . Section 90.004 or Subsection (f)" of Section 90.010. *Id.* § 90.010(n). Moreover, a claimant dismissed under Subsection (d-1) who elected to refile a claim would be given the option to use more "cost-efficient" service options when they renewed their claim, such as certified mail. *See id.* § 90.010(o).

40

When these sandblasters first asserted their claims, general docketing rules controlled and *Robinson* expert requirements applied. They would have anticipated needing to accumulate and present evidence of a medical diagnosis and establish medical causation through an expert. They had no "vested right" to have their claims remain on a court's docket indefinitely without producing reliable medical evidence of an impairment caused by silicosis. *See In re GlobalSanteFe*, 275 S.W.3d at 487. Nor did the addition of Subsection (d-1) divest them of their right to proceed to trial once they had reliable medical evidence. While Section 90.010(d-1) acts retroactively, it is not an unconstitutional retroactive law that divests the sandblasters of vested rights.

Furthermore, to the extent the sandblasters contend Chapter 90, generally, prevents the advancement of their cases due to its medical-report requirements, the statute includes Section 90.010(f), which is a "safety value" procedure through which sandblasters whose illness progressions do not match medical criteria in Section 90.004 may establish an injury through alternative proof, including submission of a medical report from a *treating* physician with equivalent, though not identical, findings. *Id.* § 90.010(f).

Having concluded Section 90.010(d-1) is not an unconstitutional retroactive law, we overrule this final constitutional challenge to the statute.

41

## Conclusion

We affirm the trial court's judgment.



Sarah Beth Landau
Justice


Justice Landau, joined by Chief Justice Radack and by Justices Keyes, Higley, Lloyd, Kelly, Goodman, Hightower, and Countiss.